MANSMANN, Circuit Judge,
dissenting, with whom Judge GREENBERG joins.
In suggesting , that “innocuous, bargained for and fully disclosed payments” from ah employer to an employee representative should be lawful, the majority has placed its *-526 own policy objectives above plain language. By its own terms, the “by reason of’ exception of 29 U.S.C. § 186(c)(1) simply does not include payments made to an employee representative merely because the payment is included in a collective bargaining agreement and the representative worked for the employer at one time. The plain language of the section 186(c)(1) exception is supported by the legislative history and purpose of the exception, and the majority’s conclusion is at odds with important federal policy. Because I believe that the payments at issue in this case do not fall within the exception of section 186(c)(1), I respectfully dissent.
I.
Where statutory language is plain, we must enforce that language according to its terms. Appalachian States Low-Level Radioactive Waste Comm’n v. O’Leary, 93 F.3d 103, 108 (3d Cir.1996); see also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1497 (3d Cir.1996) (unless literal application will produce absurd result, plain meaning is conclusive). It is for Congress, not the courts, to create exceptions or qualifications at odds with the LMRA’s plain terms: Packard Motor Car Co. v. NLRB, 330 U.S. 485, 490, 67 S.Ct. 789, 792, 91 L.Ed. 1040 (1947).
Section 302(a) of the LMRA, 29 U.S.C. § 186(a), on its face, makes it unlawful for any employer to pay any money or thing of value to any representative of its employees. As the majority recognizes, section 302(a), standing alone, prohibits the payments at issue in this case. Maj. Op., at 1053-54.
Section 302(a) contains several exceptions. Section 302(e)(1), 29 U.S.C. § 186(c)(1), renders section 302(a) inapplicable in respect to any money or other thing of value payable by an employer “to any representative of his employees, who is also an employee or former employee of such employer, as compensation for, or by reason of, his services as an employee of such employer.”
The majority concedes that the payments at issue in this ease are not payments to a current or former employee “as compensation for ... his services.” Maj. Op., at 1055. The sole issue, then, is whether the payments to a former employee, who presently works as a grievance chairperson for the union, are made “by reason of ... his services as an employee of such employer.” Contrary to the position of the majority, I must conclude that the language of section 302(c)(1) is plain and does not encompass the payments at issue here.
The “by reason of’ exception of section 302(c)(1) simply recognizes that current and former employees might have a right to receive payments from their employers that arise from their services for their employers but that are not properly classified as “compensation.” The “by reason of’ exception includes' pensions, 401(k) plans, life and health insurance, sick pay, vacation pay, jury and military leave pay, and other fringe benefits to which all employees may be entitled “by reason of’ their service. See United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir.1994) (“by reason of’ exception applies to fringe benefits “such as vacation pay, sick pay, and pension benefits”), cert. denied, — U.S. —, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995); BASF Wyandotte Corp. v. Local 227, Int’l Chem. Workers Union, AFL-CIO, 791 F.2d 1046, 1049 (2d Cir.1986) (“by reason of’ payments include “vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like”); see also Toth v. USX Corp., 883 F.2d 1297, 1303 n. 8 (7th Cir.) (severance pay and payments to disabled employees are “by reason of’ former employment), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989). Although not properly called compensation, “by reason of’ payments “arise from” the employee’s services for the employer.
Without the section 302(c)(1) exception, these payments would be illegal if paid to any employee or former employee who also worked for the union. Thus, an employee who worked full time for the company, but who held a part-time position with the union (a practice permitted by the Supreme Court’s decision in NLRB v. Town & Country Elec., Inc., — U.S. —, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995)), would be unable to be *-525 paid his salary and could not receive fringe benefits — despite working full time. Section 302(c)(1) plainly exists to enable company employees to obtain what is rightfully theirs. In other words, the section 302(e)(1) exception does not entitle union representatives to receive payments because of their service for the union; the exception allows union representatives to receive payments in spite of their current service for the union.
The key, however, is that the employee must receive the compensation or other payment because of his or her service for the employer. See, e.g., Phillips, 19 F.3d at 1575 (“by reason of’ payments “from an employer to a union official must relate to services actually rendered by the employee”); id. (under plain meaning of exception, “payment given to former employee must be for services he rendered while he was an employee”)-, BASF Wyandotte Corp. v. Local 227, 791 F.2d at 1049 (“by reason of’ payments are those “occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work”); Reinforcing Iron Workers Local Union 126 v. Bechtel Power Corp., 634 F.2d 258, 261 (6th Cir.1981) (under “literal construction” of section 302, payment to industry steward who performs services for union, not employer, are unlawful). The payments at issue in this case are entirely unrelated to the representatives’ services for the employer. I believe that the plain language of the section 302(c)(1) exception does not encompass the payments at issue here and that we must affirm the judgment of the district court.[1]
II.
Because the plain language of the “by reason of’ exception of section 302(c)(1) does not contemplate the payments at issue here, I would affirm the judgment of the district court without further discussion. Nonetheless, as I now digress briefly to relate, the legislative history and the purpose of section 302 support my conclusion that the payments at issue are unlawful.
As the majority recognizes, section 302 is a conflict-of-interest statute that is designed to eliminate practices that have the potential for corrupting the labor movement. Maj. Op., at 1057; see Phillips, 19 F.3d at 1574. As the majority also recognizes, Congress was concerned about, inter alia, bribery and other secret, back-room agreements between employers and employee representatives. See Toth, 883 F.2d at 1300.
The majority does not go far enough, however. Recognizing that “any person in a position of trust” must not “enter into transactions in which. self-interest may conflict with complete loyalty to those whom they serve,” Congress stated that “no responsible trade union official should have a personal financial interest which conflicts with the full performance of his fiduciary duties as a workers’ representative.” S.Rep. No. 187, 86th Cong. 1st Sess., reprinted in 1959 U.S.C.C.A.N. 2318, 2330-31 (quoting ethical practices code of American Federation of *-524 Labor and Congress of Industrial Organizations).[2] Congress desired to close the loopholes “which both employer representatives and union officials turned to advantage at the expense of employees.” Id. at 2330.
When he introduced section 302 in 1947, Senator Ball expressed a concern that even negotiated payments from employers might “degenerate into bribes.” 93 Cong.Rec. 4805 (1947), reprinted in II NLRB Legislative History of the Labor Management Relations Act, 1947, at 1305 (1948) (discussing welfare funds). Senator Ball stated that absent section 302, “there is a very grave danger that the funds will be used for the personal gain of union leaders.” Id. Senator Byrd echoed the concerns of Senator Ball, noting that funds from the employer should not be “paid into the treasuries of the labor unions.” Id. According to Senator Pepper, unless authorized in writing by each individual employee (in the form of dues check-off), “union leaders should not be permitted ... to direct funds paid by the company ... to the union treasury or union officers.” Id. (quoting committee report).
Section 302 therefore exists to prohibit “all forms of extortion and bribery in labor-management relations.” BASF Wyandotte Corp. v. Local 227, 791 F.2d at 1053 (emphasis supplied) (quoting S.Rep. No. 187, 86th Cong. 1st Sess. 13, reprinted in 1959 U.S.C.C.A.N. 2318, 2329). Congress was concerned with corruption through both (1) bribery of employee representatives by employers and (2) extortion by those representatives. Toth, 883 F.2d at 1300 (citing legislative history and cases). Congress explained:
The national labor policy is founded upon collective bargaining through strong and vigorous unions. Playing both sides of the street, using union office for' personal financial advantage, undercover deals, and other conflicts of interest corrupt, and thereby undermine and weaken the labor movement_ The Government ... must make sure that the power [to act as exclusive bargaining representative] is used for the benefit of workers and not for personal profit.
S.Rep. No. 187, 86th Cong. 1st Sess., reprinted in 1959 U.S.C.C.A.N. 2318, 2331.
Thus, Congress was not merely concerned about secret, back-room deals. Congress was concerned about any form of payment that could upset the balance between labor and management. The payments at issue in this case do exactly that. They create a conflict of interest for union negotiators who may agree to reduced benefits for the employees in exchange for financial support for the union.
For example, let us assume that ABC Corporation and the union are engaged in difficult negotiations over a pension plan. Also assume that the employer was stonewalling on this issue, that the union had the “correct” position, and that the company could have accepted the union’s proposal without suffering noticeable financial impact. Assume ABC said to the union negotiator: “I know your local is having financial trouble. We will pay the salaries of the grievance chairmen if you stop pushing for this pension plan.” The negotiator, who .knows that her local can no longer pay the full salaries of all the grievance chairmen, agrees, and the pension plan is dropped in favor of the financial security of the union. The agreement is included in the bargaining agreement, and both the union and ABC effectively “sell” the agreement to the employees, who ratify it (not aware that the pension plan was sacrificed in this way). According to the majority, this scenario is perfectly lawful because it was included in the agreement. According to the language, legislative history and purpose of section 302, however, this scenario represents just what Congress sought to avoid.
III.
As the majority concedes, the grievance chairmen in this case do not perform any *-523 services whatsoever for Caterpillar. Maj. Op., at 1055. Instead, the chairmen perform services exclusively for the union. The majority concludes, however, that payments to such union employees are “by reason of’ the employees’ services to the employer. First, the majority reasons that such payments were negotiated and appear in the collective bargaining agreement. Second, the majority states that, because each employee must “give up something” in negotiations with the employer so that these payments may be included in the agreement, such payments are somehow “by reason of’ the employees’ service for the employer. Finally, the majority contends that the payments at issue in this case are no different than so-called “no-docking” payments made to current employees who process employee grievances during working hours. I do not believe that the majority’s reasoning withstands scrutiny.
The majority first relies on the fact that the payments were negotiated and included in the collective bargaining agreement. Maj. Op., at 1056-57. Simply including a payment provision in a collective bargaining agreement does not, however, make the payment “by reason of’ an employee’s prior service.
Section 802(a)(1) provides that it shall be unlawful for any employer to “agree to pay” any money to any representative of any of his employees. 29 U.S.C. § 186(a)(1). Thus, actual payments to union representatives are prohibited, but so are agreements to pay union representatives. The majority places special emphasis on the fact that the payments in this case were negotiated and were not, in effect, secret agreements. Congress, on the other hand, was not concerned about the secrecy of these agreements. If an agreement to pay is unlawful under section 302(a)(1), it is illogical to use that same agreement as a basis for finding that the resultant payment is lawful under section 302(c)(1). Congress could easily have written an exception for payments by employers to union representatives pursuant to a collective bargaining agreement. Instead, Congress limited its section 302(c)(1) exception to payments in compensation for or by reason of a representative’s services for the employer.[3]
The majority does not find support in the statute (and indeed there is none) for its conclusion that bargained-for payments should be any more legal than secret agreements. Without support, the majority asserts that an open agreement makes a payment “by reason of’ services for the employer. In so doing, the majority expands the exception such that the rule is rendered a nullity.[4]
The majority next reasons that since current employees must surely “give up something” during negotiations in exchange for an agreement by the employer to pay former employees to perform union work, then those payments must be “by reason of’ their services. Maj. Op., at 1056. The majority contends that “the employees had to give up something in the bargaining process that they otherwise could have received ... in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary.” Id.
Under the majority’s reasoning, the union and the company could also agree to have the employer pay the salary of the international union’s president and subsidize the pension fund of the union’s permanent staff — all be *-522 cause the company’s employees might “give up something” during negotiations in the hopes that they too might someday receive those payments if elected to serve the union in the proper capacity. In deciding' that “giv[ing] up something” is sufficient to bring the payments at issue in this case within the “by reason of’ exception contained in section 302(c)(1), the majority has embarked on a slippery slope that will legitimize virtually any type of payment from the employer to the union so long as the payment is negotiated and included in the collective bargaining-agreement.
The majority’s reasoning violates the plain language of section 302(c)(1) in yet another way. This section allows an employer to make payments to a current or former employee by reason of “his” services as an employee. 29 U.S.C. § 186(c)(1). The majority reasons that the payments at issue in this case are lawful by reason of all of the employees’ collective service. This is contrary to the plain meaning of the statute. If a union official is to be paid by the employer, it must be by reason of that official’s service to the employer — not because of the service of others who might aspire to his position. Indeed, if the collective bargaining agreement allowed, but did not require, that the grievance chairperson be a former employee of the company, then the company might find itself paying an individual who was never an employee of the company by reason of other employees’ services for the company — a result clearly not permitted by section 302(c)(1). By relying on the collective service of the employees, the majority ignores the plain language of the statute.
I also fear that the majority’s reasoning could be construed to apply to several situations which would defy logic. For example, let us assume that an individual applies for (and obtains) a job with the employer. One day after beginning work, the individual is elected grievance chairperson. For the next thirty years,[5] the individual serves as grievance chairperson and performs no services for the employer. Thus, the individual performed eight hours’ worth of services for the employer, but was paid by the employer for thirty years. The majority’s claim that this individual is being paid for thirty years “by reason of’ his one-day service for the employer is illogical.
In another example, let us assume that two grievance chairpersons are elected on the same day. One (“Michael”) worked for the employer for twenty years. The other (“Mary”) was active in the union but never worked for the employer. Under the collective bargaining agreement in this case, the employer is required to pay Michael, but is prohibited from paying Mary. At present, both Michael and Mary perform exactly the same services, but Michael’s prior employment (for which he was already fully compensated) entitles him to continued payment from the employer.[6]
The majority’s reasoning also fails as a matter of logic in “open shops.” In an open shop, not all employees governed by the collective bargaining agreement will necessarily be members of the union. An employee who is not a member of the union (and who therefore cannot aspire to become a grievance chairperson) will nonetheless be forced to endure a lower salary or reduced benefits due to his co-workers’ decision to “give up something.” In addition, unions will be able to circumvent the problems that arise when some employees elect not to join the union or pay union dues — they .will seek agreements from the employer to subsidize representatives’ salaries in exchange for reductions in pay or benefits. These agreements will be *-521 negotiated and ratified without the input of the non-union employees. Thus, an employee who elects not to pay union dues may nonetheless face reductions in salary or benefits so that the union (which he or she does not support) may prosper. The payments at issue here are surely not “by reason of’ the nonunion employees’ services — yet those same payments are made possible by the non-union employees’ reduced salary and benefits.
IV.
Finally, the majority contends that since no-docking provisions are lawful under section 802, the payments at issue here should also be lawful. The majority writes that “it would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible, while granting a single employee eight hours per day of that same leave is a federal crime.” Maj. Op., at 1056.
In reasoning that the payments at issue here are analogous to- no-docking payments, the majority assumes (without deciding) that no-docking provisions are lawful. While some courts have so held, we have not yet addressed the lawfulness of no-docking payments. Until we do so (and until we explain our reasons for finding such payments lawful), the majority should not analogize such payments to those at issue here.
Assuming that no-docking provisions are lawful, however, we are still not required to reach the conclusion that the payments at issue in this case must also be lawful. Indeed, there are substantial differences between no-docking payments and the payments at issue here. The primary difference is that no-docking payments are made to individuals who are current employees of the company currently performing services for the company. In contrast, the payments at issue here are made to former employees of the company not performing any services for the company.
In BASF Wyandotte Corp. v. Local 227, 791 F.2d 1046, the Second Circuit observed that payments made to current employees for short absences (such as vacation pay, sick pay, or military leave pay) are all made to current employees “by reason of’ their current, ongoing services for their employer. The court then reasoned that payment to current employees for short absences to perform union work is no different from vacation pay, sick pay, and military leave pay. Id. at 1049. Thus, no-docking payments made to current employees who occasionally performed union work during working hours should be treated the same as other payments for short term absences.
Importantly, the court recognized that each of these payments were made to persons whose entitlement to the payments was “by reason of’ current service. As the court noted, “no-docking provisions have relevance only to persons who are currently serving as employees.” Id. at 1049 n. 1. The common element linking sick pay and no-docking pay “is simply that the person to whom the employer makes payment is one who performs services as an employee.” Id. at 1049 (footnote omitted). If we assume that no-docking payments are analogous to sick pay, we must conclude that they can only be made to current employees who perform services to their employers. This makes sense — former employees do not accrue sick pay or vacation pay. Likewise, they should not accrue “union-work-time pay.” See also Phillips, 19 F.3d at 1575 n. 18 (recognizing difference between no-docking provision and payments to non-employees who perform no work for company).
The majority cites several cases from our sister courts of appeals where courts concluded that no-docking provisions are lawful. In several of those cases, however, the courts carefully distinguished no-docking payments from payments made to union officials who did not perform work for the company. In BASF Wyandotte Corp. v. Local 227, Int’l Chem. Workers Union, AFL-CIO, 791 F.2d 1046 (2d Cir.1986), for example, the court stated:
[W]e do not suggest that section [302(c)(1) ] would allow an employer simply to put a union official on its payroll while assigning him no work_ [A] union official who, though on an employer’s payroll, *-520 performed no service as an employee, would not be within § 302(c)(l)’s exception.
Id. at 1050. In another case cited by the majority, the court agreed that payments to a union official put on an employee payroll but not assigned any meaningful work would violate section 302. NLRB v. BASF Wyandotte Corp., 798 F.2d 849, 856 n. 4 (5th Cir.1986).
The majority also cites Toth v. USX Corp., 883 F.2d 1297 (7th Cir.), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989). There the court of appeals stated:
At some point, it is conceivable that a bargain struck by the union and the employer might yet violate section 302 — if, for example, the terms of compensation for former employment were clearly so incommensurate with that former employment as not to qualify as payments “in compensation for or by reason of’ that employment ....
Id. at 1305. As an example of a case that would violate section 302, the court stated that “fulltime pay for no service cannot reasonably be said to be compensation ‘by reason of service as an employee.” Id. (citing BASF Wyandotte Corp. v. Local 227, 791 F.2d at 1050).
Indeed, the distinction between no-docking payments and the payments at issue here is reinforced elsewhere in the labor laws. For example, 29 U.S.C. § 158(a)(2) provides that it shall be an unfair labor practice for an employer to contribute financial support to any labor organization. This rule contains one exception: “an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.” Id. Thus, while employers may allow employees to confer with their employer during working hours without loss of pay, the employer may not contribute financial support to the labor organization. The rule bans the payments at issue here; the exception allows no-docking provisions.
Other realities dictate that no-docking payments are simply not analogous to the payments at issue here. For example, employees subject to no-docking payments are more likely to do union work on an “as needed” basis. They are also more likely to be able to schedule grievance meetings and other union work at the mutual convenience of the employees and the employer. In contrast, the grievance chairmen in this case are paid full time regardless of whether there is any union work to be done. They are never available to perform services for the employer. Thus, the four individuals who spend two hours per day performing union work (from the majority’s hypothetical) are less of a burden for the employer than one employee’s absence all day every day.
V.
While the majority emphasizes its policy determination that bargained-for payments should not be unlawful, it does not discuss several compelling policy reasons why we should affirm the judgment of the district court. These policy considerations go far beyond the need to avoid conflict of interest among union negotiators, a policy that is clear on the face of the statute and in the legislative history.
Initially, as the majority recognizes, the grievance chairperson will often take a position at odds with the position of management. Maj. Op., at 1054-55. Indeed, the grievance chairperson is most needed when the employee’s position is adverse to the employer’s. In order to be effective, the grievance chairperson often will fight zealously for the aggrieved employee and against the employer. Meanwhile, the employer must pay the chairperson’s salary. It seems illogical to me to force the employer to pay the salary of an individual whose sole function is to oppose the employer.[7]
*-519 Next, by sanctioning an agreement whereby the company pays grievance chairmen to perform services for the union, the majority unnecessarily creates uncertainty over whether the chairmen are employees of the union or employees of the company. In NLRB v. Town & Country Elec., Inc., — U.S. —, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), the Supreme Court addressed the question of who is an employee under the NLRA. The Court favorably cited several common definitions of “employee” — including “person in the service of another ... where the employer has the power or right to control and direct the employee....” Id. at —, 116 S.Ct. at 454 (citation omitted). Under this definition, a grievance chairperson appears to be an employee of the union. Citing an excerpt from the NLRA’s legislative history, however, the Court noted that “employee” includes “every man on a payroll.” Id. at —, 116 S.Ct. at 454 (citation omitted). Since grievance chairmen remain on the company’s payroll, perhaps they remain employees of the company. The majority does not decide whether the company or the union is the chairmen’s employer.[8]
The failure of the majority to decide whether the grievance chairmen are employees of the union or the employer may lead to numerous problems: Is a grievance chairperson considered part of the bargaining unit while on leave? Who will be liable if a grievance chairperson injures a third party while performing union work? Who will be responsible for providing a reasonable accommodation to a grievance chairperson with a disability who needs assistance performing her union job on the employer’s premises? What if a grievance chairperson decides to take FMLA leave— will his eligibility depend on whether the union is an FMLA employer or whether the company is an FMLA employer?[9] If a grievance chairperson is injured while performing union duties, will she nevertheless be entitled to disability or workers’ compensation from the company? May the company terminate, suspend or discipline a grievance chairperson if he engages in' activity that would qualify for termination, *-518 suspension or discipline for other employees? These questions are admittedly outside the scope of the narrow issue before us, but the majority’s decision will assuredly lead to innumerable disputes about the proper classification of individuals who remain on the company’s payroll without performing any services for the company. If we affirm the judgment of the district court, however, it is clear that individuals who leave the company to work for the union are union employees, and the above questions resolve themselves.
The final and most important policy consideration not addressed by the majority is that federal labor policy demands that labor organizations and employers remain separate and distinct from one another. The majority would sanction a pay practice that violates this important policy.
By enacting the labor laws as written, Congress insisted that the NLRB and the courts observe a sharp line between management and labor. NLRB v. Hendricks County Rural Elec. Membership Corp., 454 U.S. 170, 192-93, 102 S.Ct. 216, 230, 70 L.Ed.2d 323 (1981) (Powell, J., concurring in part and dissenting in part). Indeed, the dividing line between management and labor is “fundamental to the industrial philosophy of the labor laws in this country.” Id. at 193, 102 S.Ct. at 230; see also NLRB v. Bell Aerospace Co., Div. of Textron, Inc., 416 U.S. 267, 284-85 n. 13, 94 S.Ct. 1757, 1767 n. 13, 40 L.Ed.2d 134 (1974) (recognizing “traditional distinction between labor and management”); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 494-95, 67 S.Ct. 789, 794-95, 91 L.Ed. 1040 (1947) (Douglas, J., dissenting) (“industrial philosophy” recognizes that management and labor are “basic opposing forces”); Cedars-Sinai Medical Center v. Cedars-Sinai Housestaff Assoc., 223 NLRB 251, 254, 1976 WL 7920 (1976) (Fanning, member, dissenting) (“underlying Federal labor policy ... seeks to draw a line between labor and management”). Congress’ desire to preserve the distinction between labor and management' is evinced throughout the labor laws. See, e.g., 29 U.S.C. § 158(a). I believe that allowing an employer to provide financial support to a union, as the majority does here, blurs the important line between labor and management and creates the potential for conflict that our labor laws do not tolerate.
VI.
I recognize that labor organizations and employers have begun to embrace a more cooperative method of negotiating and dispute resolution, and I applaud labor-management efforts to retreat from the adversarial approach that has often marred the labor landscape in this country. I believe, however, that the payments sanctioned by the majority go too far. The financial support sought by the United Auto Workers in this ease contravenes the longstanding tradition of separation of labor and management. I accept and encourage arm’s length cooperation between labor and management. I cannot condone payments that threaten the independence of labor, create conflicts of interest for union negotiators, and violate the plain language of our laws. It is for Congress, not the courts, to determine if and when to permit labor organizations and employers to blur the line between them.
Accordingly, I respectfully dissent.

. The majority overstates the effect of our decision in Tmilways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101 (3d Cir.), cert. denied, 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986).
Section 302(c)(1) states that all payments made to union representatives — whether they are in direct compensation for services (wages) or merely by reason of those services (vacation pay, juty pay, et cetera) — must somehow relate to those individuals' services for the employer. The Trail-ways opinion did not merge "compensation for” and “by reason of” as the majority suggests; it does not dispute the fact that “compensation for” and "by reason of” complement each other and that the “by reason of” exception covers certain payments that are not truly compensation. Instead, in Trail-ways we recognized that certain payments to former employees may no longer be justified once the individual stops performing services for the employer.
This makes sense. For example, it is apparent that jury-duty pay is "by reason of” an employee’s services to the employer. It would be strange indeed if a former employee who retired five years ago could demand to be paid by the employer for his upcoming jury duty. As Trailways recognizes, payments to former employees, whether as compensation for or by reason of their former services, must be related to that former service. Just as former employees are no longer entitled to "by reason of” pay such as jury-duty pay, they should not be entitled to payments for performance of union work that is entirely unrelated to their former service. Accordingly, I see no reason to reverse our decision in Trailways.

. I rely on the legislative history of the Labor-Management Reporting and Disclosure Act of 1959 (an act that strengthened section 302), instead of the official history of the Labor Management Relations Act of 1947 (the act that contained section 302), because the Congressional Comments to the Labor Management Relations Act do not include a discussion of the provisions at issue here. See H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 66-67, reprinted in 1947 U.S.C.C.A.N. 1135, 1173. In the text, I include the comments of three senators made prior to the passage of section 302 that were not included in the official conference report.

. Senator Ball stated that the section 302(c)(1) exception allows payment of "money due a representative who is an employee or a former employee of the employer, on account of wages actually earned by him.” 93 Cong.Rec. 4805 (1947), reprinted in II NLRB Legislative History of the Labor Management Relations Act, 1947, at 1304 (1948) (emphasis supplied). It is apparent that Senator Ball did not contemplate that the narrow exception of section 302(c)(1) would someday encompass payments to a former employee that are entirely unrelated to the employee’s services.

. I am also concerned that by placing so much emphasis on the fact that the payments were negotiated and included in the collective bargaining agreement, the majority effectively permits employers and unions to negotiate over otherwise unlawful subjects of bargaining. It is beyond dispute that employers and unions cannot bargain over illegal subjects of bargaining. Nonetheless, the majority uses the bargaining process to legitimize a payment that is otherwise prohibited by statute.

. While the agreement in this case may contain a time restriction, that restriction did not play any part in the majority’s reasoning. Therefore, I presume that an agreement that does not contain a time restriction will not be unlawful under the majority's decision.

. Altering this example somewhat, let us assume that Michael worked for twenty years before being elected grievance chairperson, but that Mary worked one day. In this situation, the employer would be required to pay both Michael and Mary. Michael, however, “gave up” significantly more than Mary, as Michael worked for twenty years at reduced wages, while Mary only worked one day. The employer does not take into account what each individual gave up — the employer considers what the collective group gave up. I contend that the employer may not do that under the plain terms of section 302(c)(1).

. I recognize that the word "force" may be strong since the employer need not agree to pay the grievance chairperson during negotiations. Assuming that this pay practice is not unlawful, however, the practice undoubtedly constitutes a mandatory subject of bargaining. NLRB v. BASF Wyandotte Corp., 798 F.2d 849, 852-54 (5th Cir.1986). Thus, if the employer refused to accede to such a pay provision, the employees could strike over this issue.
Indeed, those employees who may have the most influence in swaying other employees’ opinions regarding strike decisions are probably the same individuals who are most likely to be elected to the position of grievance chairmen. I *-519 envision the situation where an employee who seeks the position of grievance chairperson may seek to insure that his or her desired position is fully funded by the employer before he or she accepts the position — even if that means encouraging a strike. Even the possibility that this might occur demonstrates the conflict of interest that will surely arise among those individuals who may seek the funded positions.

. This uncertainty will extend beyond cases arising under the NLRA. The Supreme Court recently held that, under Title VII of the Civil Rights Act of 1964, the test for deciding whether an employer "has” a particular employee is whether the employer has "an employment relationship" with the individual. Walters v. Metropolitan Educ. Enters., Inc., —U.S. —, —, 117 S.Ct. 660, —, 136 L.Ed.2d 644 (1997). The Court noted, however, that "the employment relationship is most readily demonstrated by the individual's appearance on the employer’s payroll.” Id. at —, 117 S.Ct. at 663; see also Equal Employment Opportunity Commission Notice No. N-915-052, Policy Guidance: Whether Part-Time Employees Are Employees (Apr. 1990), at 24, reprinted in 3 EEOC Compl.Man. (BNA), at N:3311 (interpreting both Title VII and ADEA; while one's status as an employee is defined by examining the employment relationship, "[t]he payroll is a reliable indicator of those individuals who have an employment relationship with the employer and therefore are employees.”). While grievance chairmen have an employment relationship with the union (indicating that the employer is the union), their relationship with the company is not completely severed, and they continue to appear on the company’s payroll (indicating that the employer is the company).
I would note also that this is not a traditional dual-employer case where both the union and the company may be considered employers of the grievance chairmen. In the traditional dual-employer case, the individual performs services for both the company and the union and is paid by both the company and the union for the services performed for the respective payor. In this case, in contrast, the individuals perform services exclusively for one entity and are paid exclusively by another.

. The Senate Report accompanying the Family and Medical Leave Act of 1993 states that the term “employ" means "maintain on the payroll.” S.Rep. No. 103-3, 103d Cong. 1st Sess. 22, reprinted in 1993 U.S.C.C.A.N. 3, 24 (individuals on leaves of absence are considered employees "so long as they are on the employer’s payroll.”). It would seem, therefore, that grievance chairmen are employees of the company for purposes of the FMLA. The Report also states, however, that Congress desired that "employ” under the FMLA mean the same as "employ" under Title VII. As noted supra note 8, it is not clear whether the union or the company employs grievance chairmen for the purposes of Title VII.