# NATIONAL LABOR RELATIONS BOARD *v.* TOWN & COUNTRY ELECTRIC, INC., ET AL.

No. 94–947.   Argued October 10, 1995—Decided November 28, 1995

86

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General Days, Paul A. Engelmayer, Linda Sher, Norton J. Come, Peter Winkler,* and *John Emad Arbab.*

*James K. Pease, Jr.,* argued the cause for respondents. With him on the brief for respondent Town & Country Electric, Inc., was *Douglas E. Witte. Stephen D. Gordon, Laurence Gold, Laurence J. Cohen, Marsha S. Berzon, Mary Lynne Werlwas,* and *Scott A. Kronland* filed briefs for respondent union.*

---

*Steven R. Shapiro* and *Alan Hyde* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Associated Builders and Contractors, Inc., et al. by *Maurice Baskin, Jan S. Amundson,* and *Quentin Riegel;* for the Associated General Contractors of America by *Joe F. Canterbury, Jr., Frederic Gover,* and *Michael E. Kennedy;* for the Chamber of Commerce of the United States by *Marshall B. Babson, Stanley R. Strauss, Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* and for the Labor Policy Association by *Robert E. Williams* and *Daniel V. Yager.*

*Michael T. Manley, G. Gordon Atcheson, John J. Blake,* and *Michael J. Stapp* filed a brief for the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO, CFL, as *amicus curiae.*

JUSTICE BREYER delivered the opinion of the Court.

Can a worker be a company's "employee," within the terms of the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*, if, at the same time, a union pays that worker to help the union organize the company? We agree with the National Labor Relations Board that the answer is "yes."

I

The relevant background is the following: Town & Country Electric, Inc., a nonunion electrical contractor, wanted to hire several licensed Minnesota electricians for construction work in Minnesota. Town & Country (through an employment agency) advertised for job applicants, but it refused to interview 10 of 11 union applicants (including two professional union staff) who responded to the advertisement. Its employment agency hired the one union applicant whom Town & Country interviewed, but he was dismissed after only a few days on the job.

The members of the International Brotherhood of Electrical Workers, Locals 292 and 343 (Union), filed a complaint with the National Labor Relations Board claiming that Town & Country and the employment agency had refused to interview (or retain) them because of their union membership. See National Labor Relations Act (Act) §§ 8(a)(1) and (3), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1) and (3) (1988 ed.). An Administrative Law Judge ruled in favor of the Union members, and the Board affirmed that ruling. *Town & Country Elec., Inc.*, 309 N. L. R. B. 1250, 1258 (1992).

In the course of its decision, the Board determined that all 11 job applicants (including the two Union officials and the one member briefly hired) were "employees" as the Act defines that word. *Ibid.* The Board recognized that under well-established law, it made no difference that the 10 members who were simply applicants were never hired. See

*Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 185–186 (1941) (statutory word "employee" includes job applicants, for otherwise the Act's prohibition of "'discrimination in regard to hire'" would "serve no function"). Neither, in the Board's view, did it matter (with respect to the meaning of the word "employee") that the Union members intended to try to organize the company if they secured the advertised jobs, nor that the Union would pay them while they set about their organizing. The Board then rejected the company's fact-based explanations for its refusals to interview or to retain these 11 "employees" and held that the company had committed "unfair labor practices" by discriminating on the basis of union membership. *Town & Country Elec., supra,* at 1250, n. 3, 1256, 1258.

The United States Court of Appeals for the Eighth Circuit reversed the Board. It held that the Board had incorrectly interpreted the statutory word "employee." In the court's view, that key word does not cover (and therefore the Act does not protect from antiunion discrimination) those who work for a company while a union simultaneously pays them to organize that company. 34 F. 3d 625, 629 (1994). See also *H. B. Zachry Co.* v. *NLRB*, 886 F. 2d 70, 75 (CA4 1989). For this threshold reason the court refused to enforce the Board's order.

Because other Circuits have interpreted the word "employee" differently, see, *e. g., Willmar Elec. Service, Inc.* v. *NLRB*, 968 F. 2d 1327, 1330–1331 (CADC 1992) (paid union organizers can be "employees" protected by the Act), cert. denied, 507 U. S. 909 (1993); *NLRB* v. *Henlopen Mfg. Co.*, 599 F. 2d 26, 30 (CA2 1979) (same), we granted certiorari. We now resolve the conflict in the Board's favor.

## II

The Act seeks to improve labor relations ("eliminate the causes of certain substantial obstructions to the free flow of commerce," 29 U. S. C. § 151 (1988 ed.)) in large part by granting specific sets of rights to employers and to employ-

ees. This case grows out of a controversy about rights that the Act grants to "employees," namely, rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." §157. We granted certiorari to decide only that part of the controversy that focuses upon the meaning of the word "employee," a key term in the statute, since these rights belong only to those workers who qualify as "employees" as that term is defined in the Act. See, *e. g.*, §158(a)(1) ("unfair labor practice" to "interfere with . . . *employees* in the exercise of the rights guaranteed in section 157 of this title") (emphasis added).

The relevant statutory language is the following:

> "*The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise,* and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." §152(3) (emphasis added).

We must specifically decide whether the Board may lawfully interpret this language to include company workers who are also paid union organizers.

We put the question in terms of the Board's lawful authority because this Court's decisions recognize that the Board

often possesses a degree of legal leeway when it interprets its governing statute, particularly where Congress likely intended an understanding of labor relations to guide the Act's application. See, *e. g.*, *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 891 (1984) (interpretations of the Board, the agency that Congress "'created . . . to administer the Act,'" will be upheld if "reasonably defensible") (internal citation omitted); *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 786 (1990) (Congress delegated to the Board "primary responsibility for developing and applying national labor policy"); *ABF Freight System, Inc.* v. *NLRB*, 510 U. S. 317, 324 (1994) (the Board's views are entitled to "the greatest deference"). See also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). We add, however, that the Board needs very little legal leeway here to convince us of the correctness of its decision.

Several strong general arguments favor the Board's position. For one thing, the Board's decision is consistent with the broad language of the Act itself—language that is broad enough to include those company workers whom a union also pays for organizing. The ordinary dictionary definition of "employee" includes any "person who works for another in return for financial or other compensation." American Heritage Dictionary 604 (3d ed. 1992). See also Black's Law Dictionary 525 (6th ed. 1990) (an employee is a "person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed"). The phrasing of the Act seems to reiterate the breadth of the ordinary dictionary definition, for it says "[t]he term 'employee' shall include *any* employee." 29 U. S. C. § 152(3) (1988 ed.) (emphasis added). Of course, the Act's definition also contains a list of exceptions, for example, for independent contractors, agricultural laborers, domestic workers, and employees sub-

ject to the Railway Labor Act, 45 U. S. C. § 151 *et seq.;* but no exception applies here.

For another thing, the Board's broad, literal interpretation of the word "employee" is consistent with several of the Act's purposes, such as protecting "the right of employees to organize for mutual aid without employer interference," *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, 798 (1945); see also 29 U. S. C. § 157 (1988 ed.); and "encouraging and protecting the collective-bargaining process." *Sure-Tan, Inc.* v. *NLRB, supra,* at 892. And, insofar as one can infer purpose from congressional reports and floor statements, those sources too are consistent with the Board's broad interpretation of the word. It is fairly easy to find statements to the effect that an "employee" simply "means someone who works for another for hire," H. R. Rep. No. 245, 80th Cong., 1st Sess., 18 (1947), and includes "every man on a payroll," 79 Cong. Rec. 9686 (1935) (colloquy between Reps. Taylor and Connery). See also S. Rep. No. 573, 74th Cong., 1st Sess., 6 (1935) (referring to an employee as a "worker"); H. R. Rep. No. 969, 74th Cong., 1st Sess., 8 (1935) (same); H. R. Rep. No. 972, 74th Cong., 1st Sess., 8 (1935) (same); H. R. Rep. No. 1147, 74th Cong., 1st Sess., 10 (1935) (same). At the same time, contrary statements, suggesting a narrow or qualified view of the word, are scarce, or nonexistent—except, of course, those made in respect to the specific (here inapplicable) exclusions written into the statute.

Further, a broad, literal reading of the statute is consistent with cases in this Court such as, say, *Sure-Tan, Inc.* v. *NLRB, supra* (the Act covers undocumented aliens), where the Court wrote that the "breadth of § 2(3)'s definition is striking: the Act squarely applies to 'any employee.'" 467 U. S., at 891. See *NLRB* v. *Hendricks County Rural Elec. Membership Corp.,* 454 U. S. 170, 189–190 (1981) (certain "confidential employees" fall within the definition of "employees"); *Phelps Dodge Corp.* v. *NLRB,* 313 U. S., at 185–186 (job applicants are "employees"). Cf. *Chemical Workers* v.

*Pittsburgh Plate Glass Co.*, 404 U. S. 157, 166 (1971) (retired persons are not "employees" because they do not "work for another for hire"). See also *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131–132 (1944) (independent contractor-like newsboys are "employees"); *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485, 488–490 (1947) (company foremen are "employees"). But see 61 Stat. 137–138, 29 U. S. C. § 152(3) (1988 ed.) (amending Act to overrule *Hearst* and *Packard* by explicitly excluding independent contractors and supervisory employees).

Finally, at least one other provision of the 1947 Labor Management Relations Act seems specifically to contemplate the possibility that a company's employee might also work for a union. This provision forbids an employer (say, the company) to make payments to a person employed by a union, but simultaneously exempts from that ban wages paid by the company to "any . . . employee of a labor organization, who is *also* an employee" of the company. 29 U. S. C. § 186(c)(1) (1988 ed., Supp. V) (emphasis added). If Town & Country is right, there would not seem to be many (or any) human beings to which this last phrase could apply.

## III

Town & Country believes that it can overcome these general considerations, favoring a broad, literal interpretation of the Act, through an argument that rests primarily upon the common law of agency. It first argues that our prior decisions resort to common-law principles in defining the term "employee." See *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U. S. 318, 323 (1992) (using common-law test to distinguish between "employee" and "independent contractor" under Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 *et seq.*); *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 739–740 (1989) (using common-law test to distinguish between "employee" and "independent contractor" under Copyright Act of 1976, 17

U. S. C. § 101 *et seq.*); *NLRB* v. *United Ins. Co. of America,*
390 U. S. 254, 256 (1968) (using common-law test to distin-
guish between "employee" and "independent contractor"
under NLRA). And it also points out that the Board itself,
in its decision, found "no bar to applying common law agency
principles to the determination whether a paid union orga-
nizer is an 'employee,'" *Town & Country Elec., Inc.,* 309
N. L. R. B., at 1254.

Town & Country goes on to argue that application of
common-law agency principles *requires* an interpretation of
"employee" that excludes paid union organizers. It points
to a section of the Restatement (Second) of Agency (dealing
with *respondeat superior* liability for torts), which says:

> "Since . . . the relation of master and servant is depend-
> ent upon the right of the master to control the conduct
> of the servant in the performance of the service, giving
> service to two masters at the same time normally in-
> volves a breach of duty by the servant to one or both of
> them . . . . [A person] cannot be a servant of two mas-
> ters in doing an act as to which an intent to serve one
> necessarily excludes an intent to serve the other." Re-
> statement (Second) of Agency § 226, Comment *a,* p. 499
> (1957).

It argues that, when the paid union organizer serves the
union—at least at certain times in certain ways—the orga-
nizer is acting adversely to the company. Indeed, it says,
the organizer may stand ready to desert the company upon
request by the union, in which case, the union, not the com-
pany, would have "the right . . . to control the conduct of the
servant." *Ibid.* Thus, it concludes, the worker must be the
servant (*i. e.,* the "employee") of the union alone. See *id.,*
§ 1, and Comment *a,* p. 8 ("agent" is one who agrees to act
"subject to [a principal's] control").

As Town & Country correctly notes, in the context of re-
viewing lower courts' interpretations of statutory terms, we

have said on several occasions that when Congress uses the term "employee" in a statute that does not define the term, courts interpreting the statute " 'must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of th[at] ter[m] . . . . In the past, when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.' " *Nationwide Mut. Ins. Co.* v. *Darden, supra,* at 322–323 (quoting *Community for Creative Non-Violence* v. *Reid, supra,* at 739–740). At the same time, when reviewing the *Board's* interpretation of the term "employee" as it is used in the Act, we have repeatedly said that "[s]ince the task of defining the term 'employee' is one that 'has been assigned primarily to the agency created by Congress to administer the Act,' . . . the Board's construction of that term is entitled to considerable deference . . . ." *Sure-Tan, Inc.* v. *NLRB,* 467 U. S., at 891 (quoting *NLRB* v. *Hearst Publications, Inc., supra,* at 130); *NLRB* v. *Hendricks County Rural Elec. Membership Corp.,* 454 U. S., at 177–190. In some cases, there may be a question about whether the Board's departure from the common law of agency with respect to particular questions and in a particular statutory context, renders its interpretation unreasonable. See *NLRB* v. *United Ins. Co., supra,* at 256 ("independent contractor" exclusion). But no such question is presented here since the Board's interpretation of the term "employee" is consistent with the common law.

Town & Country's common-law argument fails, quite simply, because, in our view, the Board correctly found that it lacks sufficient support in common law. The Restatement's hornbook rule (to which the quoted commentary is appended) says that a

"person *may* be the servant of two masters . . . *at one time as to one act,* if the service to one does not involve

*abandonment* of the service to the other." Restatement (Second) of Agency § 226, at 498 (emphasis added).

The Board, in quoting this rule, concluded that service to the union for pay does not "involve abandonment of . . . service" to the company. 309 N. L. R. B., at 1254.

And, that conclusion seems correct. Common sense suggests that as a worker goes about his or her *ordinary* tasks during a working day, say, wiring sockets or laying cable, he or she *is* subject to the control of the company employer, whether or not the union also pays the worker. The company, the worker, the union, all would expect that to be so. And, that being so, that union and company interests or control might *sometimes* differ should make no difference. As Prof. Seavey pointed out many years ago, "[o]ne can be a servant of one person for some acts and the servant of another person for other acts, even when done at the same time," for example, where "a city detective, in search of clues, finds employment as a waiter and, while serving the meals, searches the customer's pockets." W. Seavey, Handbook of the Law of Agency § 85, p. 146 (1964). The detective is the servant both "of the restaurateur" (as to the table waiting) and "of the city" (as to the pocket searching). *Ibid.* How does it differ from Prof. Seavey's example for the company to pay the worker for electrical work, and the union to pay him for organizing? Moreover, union organizers may limit their organizing to nonwork hours. See, *e. g., Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793 (1945); *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 492–493 (1978). If so, union organizing, when done for pay but during *nonwork* hours, would seem equivalent to simple moonlighting, a practice wholly consistent with a company's control over its workers as to their assigned duties.

Town & Country's "abandonment" argument is yet weaker insofar as the activity that constitutes an "abandonment," *i. e.,* ordinary union organizing activity, is itself specifically protected by the Act. See, *e. g., ibid.* (employer restrictions

on union solicitation during nonworking time in nonworking areas are presumptively invalid under the Act). This is true even if a company perceives those protected activities as disloyal. After all, the employer has no legal right to require that, as part of his or her service to the company, a worker refrain from engaging in protected activity.

Neither are we convinced by the practical considerations that Town & Country adds to its agency law argument. The company refers to a Union resolution permitting members to work for nonunion firms, which, the company says, reflects a union effort to "salt" nonunion companies with union members seeking to organize them. Supported by *amici curiae*, it argues that "salts" might try to harm the company, perhaps quitting when the company needs them, perhaps disparaging the company to others, perhaps even sabotaging the firm or its products. Therefore, the company concludes, Congress could not have meant paid union organizers to have been included as "employees" under the Act.

This practical argument suffers from several serious problems. For one thing, nothing in this record suggests that such acts of disloyalty were present, in kind or degree, to the point where the company might lose control over the worker's normal workplace tasks. Certainly the Union's resolution contains nothing that suggests, requires, encourages, or condones impermissible or unlawful activity. App. 256–258. For another thing, the argument proves too much. If a paid union organizer might quit, leaving a company employer in the lurch, so too might an unpaid organizer, or a worker who has found a better job, or one whose family wants to move elsewhere. And if an overly zealous union organizer might hurt the company through unlawful acts, so might another unpaid zealot (who may know less about the law), or a dissatisfied worker (who may lack an outlet for his or her grievances). This does not mean they are not "employees."

Further, the law offers alternative remedies for Town & Country's concerns, short of excluding paid or unpaid union

organizers from all protection under the Act. For example, a company disturbed by legal but undesirable activity, such as quitting without notice, can offer its employees fixed-term contracts, rather than hiring them "at will" as in the case before us; or it can negotiate with its workers for a notice period. A company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker, file a complaint with the Board, or notify law enforcement authorities. See, *e. g., NLRB* v. *Electrical Workers,* 346 U. S. 464, 472–478 (1953); *Willmar Elec. Service* v. *NLRB,* 968 F. 2d, at 1330 (arsonist who is also union member is still an "employee," but may be discharged). See also *Budd Mfg. Co.* v. *NLRB,* 138 F. 2d 86, 89–90 (CA3 1943) (worker who was intoxicated while on duty, "came to work when he chose and . . . left the plant and his shift as he pleased," and utterly failed to perform his assigned duties is still an "employee" protected under the Act), cert. denied, 321 U. S. 778 (1944). And, of course, an employer may as a rule limit the access of *non*employee union organizers to company property. *Lechmere, Inc.* v. *NLRB,* 502 U. S. 527, 538 (1992); *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, 112 (1956).

This is not to say that the law treats paid union organizers like other company employees in every labor law context. For instance, the Board states that, at least sometimes, a paid organizer may not share a sufficient "community of interest" with other employees (as to wages, hours, and working conditions) to warrant inclusion in the same bargaining unit. Brief for National Labor Relations Board 33, n. 14. See, *e. g., NLRB* v. *Hendricks County Rural Elec. Membership Corp.,* 454 U. S., at 190 (some confidential workers, although "employees," may be excluded from bargaining unit). We need not decide this matter. Nor do we express any view about any of the other matters Town & Country raised before the Court of Appeals, such as whether or not Town & Country's conduct (in refusing to interview, or to retain, "employees" who were on the union's payroll) amounted to an

unfair labor practice. See 34 F. 3d, at 629. We hold only that the Board's construction of the word "employee" is lawful; that term does not exclude paid union organizers.

## IV

For these reasons the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*