176 F.3d 948
 161 L.R.R.M. (BNA) 2233, 138 Lab.Cas. P 10,425
 STARCON, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Brotherhood of Boilermakers, Iron Ship
Builders, Blacksmith, Forgers and Helpers,
AFL-CIO, Intervening Respondent, Cross-Petitioner.
 Nos. 97-2709, 97-3020.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 31, 1999.
Decided May 4, 1999.
 
 Cameron Pierce, J. Roy Weathersby (argued), Littler Mendelson, Atlanta, GA, for Petitioner, Cross-Respondent.
 Elizabeth Kinney, National Labor Relations Board, Chicago, IL, John D. Burgoyne, Rachel Gartner (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Intervening Respondent, Cross-Petitioner National Labor Relations Board.
 Michael T. Manley, G. Gordon Atcheson, Blake & Uhlig, Kansas City, KS, for Intervening Respondent, Cross-Petitioner International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmith, Forgers and Helpers, AFL-CIO.
 Before POSNER, Chief Judge, and FLAUM and MANION, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The Labor Board asks us to enforce, and the employer, Starcon, asks us to set aside, the Board's order finding that Starcon violated the National Labor Relations Act by discriminating against applicants for employment on the basis of their intent to organize Starcon's workforce. 29 U.S.C. § 158(a); Starcon, Inc., 323 N.L.R.B. 977 (1997). The case involves the practice called "salting," held protected by the Act in NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995). The term refers to union organizers' applying for jobs with nonunion employers with the aim of organizing the employer's workforce. Actually the proximate aim, in this case as commonly, is to precipitate an unfair labor practice proceeding that will result in heavy backpay costs to the employer and weaken his ability to fight future organizing efforts (since his freedom of action will be limited by the cease and desist order that the Board will enter). See Herbert R. Northrup, " 'Salting' the Contractors' Labor Force: Construction Unions Organizing With NLRB Assistance," 14 J. Lab. Res. 469, 471-73 (1993); Note, "Organizing Worth Its Salt: The Protected Status of Paid Union Organizers," 108 Harv. L. Rev. 1341, 1345-46 (1995). The applicants went out of their way to identify themselves to Starcon as "voluntary union organizers," which they would hardly have done had they thought they had a chance to organize Starcon's employees. Their self-identification made it much more likely that Starcon would refuse to hire them and would take other measures to prevent them from organizing its employees.
 
 
 2
 A modest-sized, privately owned company, Starcon does maintenance and repair work on midwestern petrochemical refineries. Some of its work consists of "turnaround" projects, in which the refinery is shut down while the repair work is done. For obvious reasons this work is done "round the clock, with the consequence that when Starcon has a turnaround project its labor needs soar. In 1994 it was hired to do two such projects, and it began advertising for workers with the relevant experience. The boilermakers" union rounded up a number of its members to serve as voluntary union organizers, and on June 27 Starcon received in the mail job applications from 80 of them. Starcon returned the applications to the senders, stating that it didn't accept applications through the mail--that any applicant would have to appear in person for an interview in Starcon's office in Manhattan, Illinois. This was a new policy, and there was substantial evidence unnecessary to detail that it was motivated by Starcon's desire not to hire workers who would set about to organize the workforce and, if successful in doing so, force the company to bargain collectively with the union. Some of the organizers did apply in person, but all but two of these were turned down and those two were treated in a discriminatory fashion after being hired.
 
 
 3
 Starcon emphasizes that more than two weeks before the flood of applications from the union organizers hit, it had signed a contract with a company called BE & K to subcontract some of the turnaround work to that company. The contract did not, however, require Starcon to subcontract any of the work--it just gave Starcon the option to "request from the Contractor services as deemed necessary from time to time, and the Contractor will provide such services" according to specified terms that included a wage far higher than Starcon's advertised pay for workers. Given the wage differential, it is no surprise that Starcon continued trying to hire workers for the turnaround projects--provided they weren't union organizers. BE & K did supply Starcon with a number of workers for these projects, but only after Starcon turned away the union organizers who were willing to work for the lower, advertised rate of pay. Apparently Starcon regarded BE & K as a backup source of labor supply should Starcon not be able to hire all the workers it needed. So had it not been for Starcon's hostility to the union, it would have hired at least some of the 80 union-organizer applicants in preference to farming out the work to BE & K at a higher cost.
 
 
 4
 The big issue, made such by a decision of the Sixth Circuit in a very similar case also involving mass salting by the boilermakers' union, NLRB v. Fluor Daniel, Inc., 161 F.3d 953 (6th Cir.1998), is whether the Board was required to "match" the organizer applicants to the job openings, that is, to prove that they really were the people whom Starcon would have hired for the jobs for which it had openings had these applicants not been connected with a union. The Board takes the position that if, as it was entitled to find here on the basis of the evidence presented to it, the employer refuses for an improper motive even to consider hiring an applicant, the violation of the Act is complete at that point. KRI Constructors, Inc., 290 N.L.R.B. 802 (1988); cf. E & L Transport Co. v. NLRB, 85 F.3d 1258, 1271 (7th Cir.1996). It is unclear whether, as the Fourth Circuit deems essential to the validity of "refusal to consider" liability, Ultrasystems Western Constructors, Inc. v. NLRB, 18 F.3d 251, 255-56 (4th Cir.1994), the Board must also find that there was an actual vacancy for which the employer refused to consider the applicant.
 
 
 5
 At argument the Board's lawyer disclaimed any suggestion that the "refusal to consider" theory entitles all the applicants whom the employer refuses to consider to reinstatement and backpay. For suppose, even if there were a vacancy, that these applicants were unqualified to fill it and so would never have been hired even if they wore "Right to Work" buttons rather than "VUO" buttons. Then they would not have been harmed by the company's bad motive and so could not get any kind of remedy. The Sixth Circuit has now held that the issue of injury to the individual applicants cannot thus be postponed to the remedial stage; there is no violation without an injury. "It cannot be an unfair labor practice merely for an employer to harbor animus against union members applying for jobs that do not exist or have already been filled, or for which they are not qualified." 161 F.3d at 967. In so holding, the Sixth Circuit went into conflict with the D.C. Circuit, which has upheld the Board's approach. Great Lakes Chemical Corp. v. NLRB, 967 F.2d 624, 628-30 (D.C.Cir.1992). Our court has not yet taken sides.
 
 
 6
 The Sixth Circuit did not take issue with the Board's rule, upheld in NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), that in a mixed-motive case the employer has the burden of proving that the applicant whom it turned down on the basis of his union affiliation would not have been hired in any event because he was unqualified. But the court pointed out, first and correctly, that the employer's defense in such a case is a defense to liability and not just a consideration going to the scope of the remedy in a case in which liability has been established. 161 F.3d at 968. Second, and as it seems to us dubiously, the court reasoned that if "there were no jobs available for which [the employee] was qualified," this motive for turning him down "completely predominates over the first" motive, that is, hostility to the union. Id. We are wary of a jurisprudence of adjectives. We cannot see what difference it makes whether an employee just is not qualified for a job, or is in a different job classification altogether. Suppose that one of the union organizers applying for a job as a welder on one of Starcon's turnaround projects was in fact a penguin wearing a VUO button. If Starcon turned down the penguin's application, and there was proof that Starcon would never hire anyone wearing a VUO button, this would be a classic mixed-motive case, and it would therefore be open to Starcon to prove that, in any event, it would never hire a penguin, because penguins can't weld. But the burden of proving this would be on Starcon. We don't see why the Board would have the burden of proving (if it could) that Starcon would hire nonunion penguins.
 
 
 7
 But the Sixth Circuit's first point seems to us solid; the defense in a mixed-motive case is a defense to liability, so the Board can't shove it off to the compliance stage of the proceeding. Concretely, the Board cannot enter a cease and desist order or direct other nonmonetary relief against an employer who can prove that even if he had been free from any hostility to the union he would not have hired the particular union members who applied. The Board must show that at least one such applicant would have been hired. Ultrasystems Western Constructors, Inc. v. NLRB, supra, 18 F.3d at 256-57. It does not have to show which one, unless and until it seeks a remedy on behalf of that particular worker. The worker is not the plaintiff; the Board is; and it is entitled to order nonmonetary relief upon proof of a violation, which requires only that one worker have been discriminated against on the basis of his union sympathies or affiliation. The worker might have gotten a higher-paying job and thus have no interest in being reinstated and have suffered no loss from the discrimination. There would be no basis for ordering reinstatement and backpay in such a case but the Board would still be entitled to enter a cease and desist order to provide some assurance against a repetition of the violation. See 29 U.S.C. § 160(c); Communication Workers of America v. NLRB, 784 F.2d 847, 852-53 (7th Cir.1986); Taracorp Industries, 273 N.L.R.B. 221 (1984). The record is reasonably clear that some at least of the 80 union organizers who applied for jobs with Starcon were qualified for the turnaround jobs being advertised, and given that Starcon clearly needed additional workers and could have gotten them more cheaply by hiring applicants than by subcontracting the work, we conclude that there is substantial evidence of a violation, and so the entry of a cease and desist order was proper.
 
 
 8
 But that is not all there is to the order. It does not merely direct Starcon to cease and desist from discriminating against union members and supporters; it orders Starcon to offer jobs to all 80 union-organizer applicants, as well as to make them whole by giving them backpay to compensate them for any loss of wages that they may have sustained as a result of being turned down. The evidence does not show that Starcon would have offered all 80 applicants jobs. On the contrary, since Starcon did not hire, either through BE & K or otherwise, 80 additional workers to work on the turnaround projects, it is certain that it would not have given jobs to all 80 applicants even if it hadn't known they were connected to a union. The order indisputably is overbroad. If the Board wants to order relief to particular "salters," it has, at a minimum, to determine how many of them Starcon would have hired had it not been actuated by hostility to unionization. Suppose the number is 10. If it were feasible to determine which 10, then those are the ones who would be ordered reinstated (actually, "instated," since none had been hired) with backpay. If this were infeasible, Starcon could be ordered to offer reinstatement to the first 10 applicants who were qualified.
 
 
 9
 The Board may intend to cut down the order in the compliance proceedings that are the normal sequel to such orders. But that would be a confusion of scope with compliance. The scope of the order must be determined before the order is entered, not afterwards. Ultrasystems Western Constructors, Inc. v. NLRB, supra, 18 F.3d at 258-59. The Board is asking us not merely to uphold its order but also to enforce it, that is, to issue an injunction that will enable violations of the order to be punished as contempts of court. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 894 n. 13, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); NLRB v. Howard Immel, Inc., 102 F.3d 948, 952 (7th Cir.1996); NLRB v. P*I*E Nationwide, Inc., 894 F.2d 887, 893 (7th Cir.1990); Mitchellace, Inc. v. NLRB, 90 F.3d 1150, 1159 (6th Cir.1996). We can hardly do this when the order is as tentative, and its practical scope and operation as indefinite, as the order is here. See J.I. Case Co. v. NLRB, 321 U.S. 332, 341, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Blankenship & Associates, Inc. v. NLRB, 54 F.3d 447, 449 (7th Cir.1995); NLRB v. Brooke Industries Inc., 867 F.2d 434, 435 (7th Cir.1989) (chambers opinion); cf. PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir.1998). Although Starcon has not objected to the scope of the order as such, the objection just indicated is implicit in its urging us to follow the Sixth Circuit's Fluor Daniel decision--which we are happy to do, but only in part. The cease and desist part of the Board's order is valid, the rest not, and therefore the order is enforced in part and denied enforcement in part, and the case is returned to the Board for the entry of a new order that will be consistent with the principles laid down in this opinion.