[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION A FACTS AND PROCEDURAL HISTORY
This is an action for tortious interference with business expectations and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The complaint, dated December 6, 2000, alleges the following. In 1988, the plaintiff, John Okonuk, worked for the defendants, Lawrence Becker, d/b/a Becker Construction, and Diane Becker, d/b/a Becker Construction Company (collectively, Becker), in Willington, Connecticut. While working for Becker, Okonuk participated in an attempt to unionize Becker's employees. Okonuk and others were discharged by Becker and replaced by nonunion employees.
Approximately ten years later, on December 29, 1998, Okonuk, now employed by Russo Trucking of Lebanon, Connecticut, and subleased to Rhodes Construction of Bolton, Connecticut, went to Becker to pick up sand, gravel and/or other construction materials that had been ordered by Rhodes Construction. Dianne Becker refused to allow Okonuk to pick up these materials, and Becker ordered Okonuk to leave the site.
Approximately seventeen months later, on May 15, 2000, Okonuk, now being subleased to Kewitt Construction of Dayville, Connecticut, again CT Page 8802 went to Becker to pick up construction materials that had been ordered, and, again, Okonuk was not allowed to pick up these materials. Okonuk alleges that Lawrence Becker verbally abused him and ordered him from the site. Later that day, Diane Becker telephoned Russo Trucking and informed it that Okonuk would not be allowed to obtain materials from Becker. Dianne Becker also telephoned Kewitt Construction, and she told Kewitt that it should terminate its contract with Russo Trucking if Russo continued to allow Okonuk to drive, explaining that Becker would not allow Okonuk to obtain any materials from its site. Okonuk further alleges that these action were "based solely upon the plaintiffs prior union activities and were in retaliation for such union activities."
On January 12, 2001, Becker filed two motions to dismiss this action. The first motion, #101, is grounded upon the preemption of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 157-58. The second motion, #102, is grounded upon improper venue. In accordance with Practice Book § 10-31, both parties have filed briefs in support of their opposing positions.
 II DISCUSSION A Exclusivity of the NLRB
Becker first moves to dismiss on the ground that the Superior Court lacks subject matter jurisdiction because this matter is preempted by § 7[1] and § 8[2] of the NLRA and falls within the exclusive jurisdiction of the National Labor Relations Board (NLRB or Board). Becker argues that "[w]here the conduct about which a plaintiff complains is arguably subject to § 7 or § 8 of the NLRA, it is within theexclusive competence of the NLRB, and a motion to dismiss for lack of subject matter jurisdiction is appropriate." (Emphasis in original; internal quotation marks omitted.) (Becker's Brief, p. 3.)
Okonuk opposes Becker's motion to dismiss on the ground that this court, not the NLRB, has jurisdiction over the subject matter of this complaint. Okonuk argues that "[the NLRA] applies to `employees,' [and Okonuk] is not an employee of [Becker] and is, therefore, outside the scope of the Act. Therefore, [he argues,] his cause of action is properly before this Court, which has subject matter jurisdiction" (Okonuk's Brief, p. 5.) In response to Okonuk's argument Becker filed a reply brief in which it argues that "[b]ecause the controversy at issue involves activity that is arguably subject to § 7 or § 8 of the NLRA, and CT Page 8803 because the NLRA covers `any employee and shall not be limited to the employees of a particular employer. . . .' the NLRB alone has jurisdiction of the controversy, to the exclusion of this court." (Emphasis in original.) (Becker's Reply Brief, p. 3.)
Becker essentially argues that a Garmon preemption exists in this case. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236,79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (claims that are arguably subject to the NLRA fall within the exclusive jurisdiction of the NLRB). The court, however, is unpersuaded. "Garmon . . . is the source of the arguably protected or prohibited standard for pre-emption. The Court stated,359 U.S., at 244: `When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of the federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.' Later the Court said: `When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence' of the Board. Id, at 245. of course, the Court explained, the Board might decide the case one way or the other, but in the `absence of the Board's clear determination that an activity is neither protected or prohibited,' id., at 246, it is not for the courts to decide the case. It is apparent from these passages that a court first must decide whether there is an arguable case for pre-emption; if there is, it must defer to the Board, and only if the Board decides that the conduct is not protected or prohibited may the court entertain the litigation. Nothing in Garmon suggests that an arguable case for pre-emption is made out simply because the Board has not decided the general issue one way or the other." Longshoremen v.David, 476 U.S. 380, 396-97, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).
"The precondition for pre-emption, that the conduct be `arguably' protected or prohibited, is not without substance. It is not satisfied by a conclusory assertion of pre-emption. . . . If the word `arguably' is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been `authoritatively rejected' by the courts or the Board. . . . The party must then put forth enough evidence to enable the court to find that the Board reasonable could uphold a claim based on such an interpretation. In this case, therefore, because the pre-emption issue turns on [the appellee's] status, the [appellant's] claim of pre-emption must be supported by a showing sufficient to permit the Board CT Page 8804 to find that [the appellee] was an employee [for purposes of the Act]. . . ." (Citations omitted.) Id., 394-95.
The term "employee" is not expressly defined within the NLRA.[3]
Despite the lack of a clear definition, however, there are some constraints that the Act places on the term. See 2 T. Kheel, Labor Law, § 8.03(1), p. 8:31 (2000). "[A]ny individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice is an employee, so long as he has not obtained any other regular and substantially equivalent employment." (Internal quotation marks omitted.) Id., 8:31-32. Accordingly, "[s]ection 2(3) of the Act expressly includes as employees any individual whose work has ceased as a consequence of, or in connect with: [1] a current labor dispute, or [2] any unfair labor practice if the individual has not obtained any other regular and substantially equivalent employment." (Emphasis added.) Id., § 8.03(2), p. 8:32; see International Union,United Automobile, Aircraft Agricultural Implement Workers of America,CIO v. Hinz, 218 F.2d 664, 665 (6th Cir. 1955) (employee that had obtained other regular and substantial employment could not be considered an employee of previous employer because the term "employee," as defined in the Act, did not apply to one that had obtained other regular and substantially equivalent employment).
Recently, in WBAI Pacifica Foundation, 328 N.L.R.B. No. 179, 1999-00 NLRB Dec. (CCH) ¶ 15250 (August 26, 1999), the Board discussed the definition of employee pursuant to the NLRA. Holding that the employee-employer relationship is necessarily an economic one, the Board found that volunteers are not covered by the Act because there is no economic component to their relationship with their `employer.' Id., slip. op., 2 The Board, basing its decision on several Supreme Court decisions, stated that: "At the heart of each of the [Supreme] Court's decisions is the principle that employee status must be determined against the background of the policies and purposes of the Act. The damage caused to the nation's commerce by the inequality of bargaining power between employees and their employers was one of the central problems addressed by the Act. A central policy of the Act is that the protection of the right of employees to organize and bargain collectively restores equality of bargaining power between employers and employees and safeguards commerce from the harm caused by labor disputes. The vision of a fundamentally economic relationship between employers and employees is inescapable." Id., slip. op. 4; see also, Seattle Opera Assn. AmericanGuild of Musical Artists, 331 N.L.R.B. No. 148, 2000-01 NLRB Dec. (CCH) ¶ 15580 (August 24, 2000) (following WBAI Pacifica Foundation, supra). The Board also noted that in cases where the Supreme Court has found employee status, "there was at least a rudimentary economic relationship . . . between employee and employer." WBAI PacificaCT Page 8805Foundation, supra, 328 N.L.R.B. No. 179, slip. op., 2; Seattle OperaAssn. American Guild of Musical Artists, supra. 331 N.L.R.B. No. 148, slip. op., 4-5.
Further, as noted by the Supreme Court in upholding the Board's definition of employee in NLRB v. Town Country Electric, Inc.,516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995) (a company worker that is simultaneously a paid union organizer fits the statutory definition of employee), "the ordinary dictionary definition of `employee' includes any `person who works for another in return for financial or other compensation.' American Heritage Dictionary 604 (3d ed. 1992). See also Black's Law Dictionary 525 (6th ed. 1990) (an employee is a `person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed')." Id., 90.
In the present case, Okonuk received no wages or compensation from Becker, and Becker had no right to control or direct Okonuk in the material details of his work. Although Okonuk had an employee-employer relationship with Rhodes and arguably with Kewitt, there is no allegation in the complaint, nor is there anything in the motion to dismiss, that would arguably bring him within the employee-employer relationship with Becker as well. Accordingly, the court finds that the relationship between Okonuk and Becker is not that of employer and employee as contemplated by the Act.
Further, even if the court were to determine that, because of some relationship between Becker, Rhodes and Kewitt, Okonuk and Becker did fit the employer-employee relationship regulated by the Act, the causes of action contained in Okonuk's complaint do not fall within §§ 7 and 8 of the NLRA. To demonstrate this, a brief review of the NLRA and its relevant sections is warranted.
The purpose of the NLRA is to "define and protect the rights of employees and employers, to encourage collective bargaining, and to eliminate certain practices on the part of labor and management that are harmful to the general welfare." National Labor Relations Board, A Guide to Basic Law and Procedures under the National Labor Relations Act (1997) p. 11. "[The] broad provisions [of §§ 7 and 8] govern both protected `concerted activities' and unfair labor practices." San Diego Bldg.Trades Council v. Garmon, supra, 359 U.S. 241.
"The [NLRA] states and defines the rights of employees to organize and to bargain collectively with their employers through representatives of their own choosing or not to do so. To ensure that employees can freely CT Page 8806 choose their own representatives for the purpose of collective bargaining, or choose not to be represented, the Act establishes a procedure by which they can exercise their choice at a secret-ballot election conducted by the [NLRB]. Further, to protect the rights of employees and employers, and to prevent labor disputes that would adversely affect the rights of the public, Congress has defined certain practices of employers and unions as unfair labor practices." A Guide to Basic Law and Procedures under the National Labor Relations Act, supra, p. 11.
"The rights of employees are set forth principally in Section 7 of the Act. . . .[4] Examples of the rights protected by this section are the following: [f]orming or attempted to form a union among the employees of a company; [j]oining a union whether the union is recognized by the employer or not; [a]ssisting a union to organize the employees of an employer; going out on strike to secure better working conditions; [and] [r]efraining from activity on behalf of a union." Id., 12.
"The unfair labor practices of employers are listed in Section 8(a) of the Act. . . ."[5] Section 8(a)(1) forbids an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.' Any prohibited interference by an employer with the rights of employees to organize, to form, join, or assist a labor organization, to bargain collectively, to engage in other concerted activities for mutual aid or protection or to refrain from any or all of these activities, constitutes a violation of this section. This is a broad prohibition on employer interference, and an employer violates this section whenever it commits any of the other employer unfair labor practices. In consequence, whenever a violation of Section 8(a)(2), (3), (4), or (5) is committed a violation of Section 8(a)(1) is also found." Id., 27.
Examples of employer conduct that would violate § 8(a)(1) include: "[t]hreatening employees with loss of jobs or benefits if they should join or vote for a union; [t]hreatening to close down the plant if a union should be organized in it; [q]uestioning employees about their union activities or membership in such circumstances as will tend to restrain or coerce the employees; [s]pying on union gatherings, or pretending to spy; [and] [g]ranting wage increases deliberately timed to discourage employees from forming or joining a union." Id., 27-28. It is also "illegal for an employer to discriminate in employment because of an employees's union or other group activity within the protection of the Act" under § 8(a)(3). Id., 29. Examples of § 8(a)(3) violations include: [d]ischarging employees because they urged other employees to join a union; [r]efusing to reinstate employees when jobs they are qualified for are open because they took part in a union's CT Page 8807 lawful strike . . . [and] [r]efusing to hire qualified applicants for jobs because they belong to a union." Id., 30-31.
In his complaint, Okonuk alleges that Becker tortiously interfered with his business expectations by not allowing him to obtain materials for his employer. He also alleges that Becker's actions violated CUTPA. Certainly, he does allege that Becker's interference was based upon, and in retaliation for, Okonuk's prior union activities, activities that occurred some ten years prior, but there is no allegation that Becker's actions were meant to stop or interfere with Okonuk's current union activity. In fact, in his complaint Okonuk states that he was employed as a nonunion truck driver for Russo. There are no facts or allegations that Okonuk was engaging or attempted to engage in any type of current union or other concerted activity. Nor is there any allegation that Becker's actions were meant to thwart any union or other concerted activity by Okonuk. In sum, these claims are not for unfair labor practices. Okonuk was not engaging or attempting to engage in protected activity when Becker ordered him from its site and telephoned his employer; Okonuk was merely attempting to pick up materials. "There can, of course, be no violations of § 8(a)(1) by the employer if there is no underlying § 7 conduct by the employee. Conduct must be both concerted and protected to fall within § 7." (Emphasis added.) Yesterday'sChildren, Inc. v. NLRB, 115 F.3d 36 (1st Cir. 1997).
Based upon the above analysis, the court finds that these causes of action are not arguably within the purview of the NLRA. Accordingly, Becker's motion to dismiss, based upon the exclusivity of the NLRB, is denied.
 B Improper Venue
Becker next moves to dismiss based upon improper venue, arguing that since "the plaintiff resides in Colehester, CT, and . . . the defendants reside in Willington, CT, venue in this action involving Connecticut residents is governed by Connecticut General Statutes § 51-345 (a) (3) . . . [which] provides that all civil process shall be returnable to the judicial district where either the plaintiff or defendants reside." (Becker's memorandum, p. 1.) Okonuk agrees that venue is improper but argues that, pursuant to General Statutes § 51-351, the motion to dismiss should be denied and the case transferred to the judicial district of Tolland at Rockville. The court acknowledges that venue is improper in this case, but, nevertheless, denies the motion to dismiss.
Venue concerns the place where a case may be tried, and its CT Page 8808 requirements are created for the convenience of the parties. Haigh v.Haigh, 50 Conn. App. 456, 465, 717 A.2d 837 (1998). Venue does not implicate the court's jurisdiction. Id. "Jurisdiction has to do with the authority or power of a court to hear and decide the cause of action presented to it, and its source is the constitutional and statutory provisions by which it is created." (Internal quotation marks omitted.) Id.
General Statutes § 51-351 provides that "[n]o cause shall fall on the ground that it has been made returnable to an improper location." By enacting General Statutes § 51-351, the legislature intended to provide the remedy of transfer rather than dismissal in cases of improper venue. Sprague v. Commission on Human Rights Opportunities,3 Conn. App. 484, 486, 489 A.2d 1064 (1985). "If the court has both subject matter and in personam jurisdiction. the case cannot sensibly be dismissed for want of venue." Betensky v. Opcon Associates, Inc., Superior Court, judicial district of New Haven, Docket No. 421034 (April 15, 1999, Blue, J.) (24 Conn. L. Rptr. 327, 329); see General Statutes § 51-351.
Accordingly, the court denies Becker's motion to dismiss for lack of proper venue. Further, pursuant to General Statutes § 51-347b (a)[6]
and Practice Book § 12-1,[7] the court orders this case transferred to the judicial district of Tolland at Rockyille.
Foley, J.