**NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross–Respondent,**

v.

**NIBLOCK EXCAVATING, INC., Respondent, Cross–Petitioner.**

**International Union of Operating Engineers, Local 150, AFL–CIO, Intervenor.**

Nos. 02–2242, 02–2308.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 2003.

Decided March 5, 2003.

Before FLAUM, Chief Judge, EASTERBROOK, and KANNE, Circuit Judges.

### Order

Engineers Local 150 commenced in 1998 an organizing drive at Niblock Excavating, a family-owned construction contractor in northern Indiana. Niblock opposed Local 150 by multiple means. Some were lawful, others not, the National Labor Relations Board concluded. The unlawful measures, according to the Board, included promises of benefits if the employees spurned Local 150, threats of reprisals (and some actual

reprisals) against employees who favored it, refusals to hire applicants known to support unionization, selective drug tests of union supporters, videotaping of striking employees, distribution of "Union No" buttons by supervisors who noted each employee's response, and support of a rival union, the Christian Labor 'Association. Many of the Board's findings are unchallenged in these cross-petitions to enforce (or set aside) the agency's order. The unchallenged aspects of the order are summarily enforced, see *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314–15 (7th Cir. 1991) (en banc), and the findings that support these uncontested aspects of the decision also give substance to the Board's conclusions with respect to the contested matters, for they show that the employer possessed (and acted on) an anti-union animus.

Niblock's arguments in this court center on the Board's conclusion that it violated the National Labor Relations Act by refusing to hire six union organizers who applied for jobs. Such applicants, known as salts, are "employees" under the Act even though they owe loyalty to the union, and they may not be refused positions just because of concern about that fact. See *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995); *Hartman Brothers Heating & Air Conditioning, Inc. v. NLRB*, 280 F.3d 1110 (7th Cir.2002). Niblock declined to hire any of the salts because, it insisted, it does not accept applicants from the general public but hires exclusively on referral from other employees. When the salts secured such referrals (from union adherents already employed by Niblock), the firm turned them down again, this time asserting that the letters of application were argumentative and the applicants' practices (which included taking pictures of their surroundings) suggested that they wanted to litigate rather than engage in construction work.

A great deal of the parties' attention has been devoted to the question whether substantial evidence supports the Board's decision that Niblock was motivated by anti-union animus when it reduced from six months to 30 days the period for which it keeps employment applications on file, or when it adopted the policy of hiring only on recommendation from other employees. Niblock contends that it never had a six-month retention period, that it did not alter its policies at all, and that, if it did, the alteration is beyond the scope of the charge. The Board replies that Niblock failed to make any scope-of-charge argument to the ALJ, forfeiting it, to which Niblock rejoins that any enlargement of the charge violates both the NLRA and the due process clause of the fifth amendment. The Board comes back that Niblock had to recognize the relevance of its hiring policy, so there was no lack of notice. Cf. Fed.R.Civ.P. 15(b).

All of this to-and-fro is beside the point, because the Board's decision does not depend on any of these issues. The particulars of the firm's hiring policy are irrelevant because the salts eventually applied with referrals. Because they followed the policy that Niblock says it always had, yet did not secure positions, it is unnecessary to determine which policy Niblock employed on what dates. True, ¶ 1(k) of the Board's order directs Niblock to cease "[p]romulgating, maintaining, or enforcing hiring policies for the purpose of discouraging union activities, including the refusal to accept employment applications, considering employment applications for only 30 days, purporting to hire only former employees, friends of employees, or students, and purporting to favor employees with no experience over union supporters with experience." This language just restates the Act and makes everything turn on motive. Thus if Niblock tomorrow adopts for business reasons a policy of hiring only on

referral, it would not violate either the Act or the Board's order.

■ Niblock shot itself in the foot by claiming to have a policy of hiring only persons with no experience in the trade; that claim was easily falsified (many of its workers had experience when hired). Few employers gain by training everyone from scratch, so the Board was entitled to infer that the asserted policy had been cooked up to explain a refusal to hire salts who possessed extensive experience. Niblock's transparent evasion left the Board disinclined to believe its other contentions. Nonetheless, Niblock retains the right to adopt even self-defeating policies, provided that it does so for business reasons rather than to squelch an organizing campaign. We therefore think it unnecessary to decide whether substantial evidence supports the Board's decision that Niblock changed hiring policies, for anti-union reasons, in the midst of Local 150's organizing campaign. What matters is Niblock's refusal to hire union supporters—and substantial evidence supports the Board's decision that the refusals at issue were motivated by the applicants' support of Local 150. Doubtless the Board could have reached the opposite conclusion, but it was not required to do so. It had ample reasons to conclude that persons with the salts' qualifications would have been hired if they espoused anti-union views.

Niblock argues that the Board's view about the period during which applications were retained affects the Board's order to hire the salts who were turned down in June 2000. Only one person was hired within 30 days of that decision, Niblock contends, so only one of the salts would have been hired in the absence of discrimination. The legal premise of this contention is sound: because the Board's orders must be remedial, they cannot extend beyond requiring the employer to do what it would have done had it acted lawfully.

And if only one of the salts would have been hired as a result of lawful consideration, then the remedy is limited to this outcome. The factual premise of Niblock's argument is incorrect, however. The Board found that the salts who applied in June 2000 were rejected because they were known union supporters, *not* because there were no positions open at the time (or within 30 days). They would have been turned down, the Board concluded, no matter how many positions were open, and no matter how often they renewed their applications (so as to keep them as fresh as Niblock required). This implies that the salts are entitled to be hired as of the dates that this would have occurred had their pro-union views not been held against them. More than six positions have been filled since Niblock made it clear that the salts had no hope of employment. The Board's order did not fix the dates on which each would have been hired in the absence of discrimination; that was left to compliance proceedings following Niblock's provision of the information required by ¶ 2(j) in the Board's order. We therefore pretermit the issue; it has been raised prematurely. We assume that, when determining how much back pay is owed, the Board will match the salts against actual vacancies in Niblock's work force. To the extent that some of these vacancies represent a single position (if, for example, a person hired in August quit in September and was replaced), the position may be counted only once for purposes of back pay, for only one salt could have held this job.

■ Niblock contests the Board's decision with respect to five other persons: Randall Patton, Michael Young, Brandon Taylor, Michael Cramer, and Kevin Weickart. We conclude that substantial evidence supports the Board's decision with respect to each. Patton, for example, was

a former employee of Niblock who sought to return to its employ after Niblock learned that he supported Local 150. The Board concluded that Patton was a skilled worker who would have been rehired but for his stand on unionization; Niblock insists that his application was provocative and revealed that he was unsuitable. Such a claim is grist for the trier of fact—which is to say, for the Board rather than the court. With respect to Weickart, who was fired for refusing to take a drug test, the Board deemed it suspicious that the demand for a test was made immediately after he returned to work from a strike. Niblock contends that Weickart was selected randomly by a computer; the Board, however, disbelieved the testimony of the person who managed the process and found that Weickart's selection had been manipulated by (a) advancing the date of the test, and (b) omitting from the list of those at risk of testing most (if not all) employees who had not gone out on strike. This credibility finding is plausible and thus is conclusive against Niblock. It is not necessary to discuss Young, Taylor, and Cramer separately; the Board's view with respect to each of them has substantial support in the record.

The Board's order is enforced.