**LONG ISLAND HEAD START CHILD DEVELOPMENT SERVICES, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

**Docket Nos. 05–5723–ag(L), 05–6624–ag(XAP).**

United States Court of Appeals, Second Circuit.

Argued: May 24, 2006.

Decided: Aug. 9, 2006.

David M. Cohen, Cooper, Sapir & Cohen, PC, Melville, NY, for Petitioner–Cross–Respondent.

Jeffrey L. Horowitz, (Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, of counsel, Julie B. Broido, on the brief) National Labor Relations Board, Washington, DC for Respondent–Cross–Petitioner.

Before McLAUGHLIN, JACOBS, and B.D. PARKER, Circuit Judges.

DENNIS JACOBS, Circuit Judge.

The Collective Bargaining Agreement ("CBA") governing labor relations between Long Island Head Start Child Development Services ("Head Start") and the AFL–CIO's Local 95 Chapter ("the Union") contains an "evergreen clause," under which the CBA automatically renews unless either Head Start or the Union conveys timely, written notice of a contrary intent. In a September 29, 2005 decision and order, the National Labor Relations Board ("NLRB")—evaluating whether Head Start violated its duty to bargain—concluded that, based on its caselaw, Head Start's CBA did not renew. NLRB caselaw supports the view that, once negotiations over a new CBA are ongoing, notice need be neither timely nor in writing. Head Start petitions for review, chiefly on the ground that neither party conveyed its intent—written or unwritten, timely or untimely—to terminate the CBA. The NLRB cross-petitions for enforcement. Because the NLRB provided no reasoned basis for its decision, we vacate the Board's decision and remand for future proceedings.

## BACKGROUND

Head Start provides pre-school and social services in Patchogue, New York. Head Start's employees are represented by the Union.

In 1999, the Union and Head Start entered into a CBA ("the 1999 CBA"), which had an expiry date of May 4, 2001 subject to the following automatic-renewal "evergreen clause":

> [The CBA] shall automatically renew itself and continue in full force and effect from year to year unless written notice of election to terminate or modify any provision of this Agreement is given by one party, and received by the other party not later than sixty (60) days prior to the expiration date of this Agreement or any extension thereof.

It is undisputed that, by operation of this clause, the CBA was renewed in 2001, 2002, and 2003, and that the CBA was thereby extended through at least May 4, 2004.

Under the 1999 CBA, Head Start had unilateral control over the selection of a health insurance carrier. The CBA does not speak to insurance directly, but it incorporates the Head Start Personnel Manual by reference:

> All current practices, polices and procedures regarding personnel as set forth in the Agency's Personnel Policies and Procedures Manual shall remain in effect except where modified by this Agreement.

In turn, the Personnel Manual grants Head Start the authority to modify health benefits unilaterally:

> Regular full-time employees of L.I. Head Start are eligible for Agency sponsored employee benefits unless otherwise noted after completion of six months of continuous employment. *The Agency reserves the right in its sole discretion to modify or terminate any or all benefit plan(s) permanently or temporarily at such time as it seems appropriate without consent of the union* or prior notices ... subject to the provisions of applicable laws.

Appx. at 115 (emphasis added).

On June 1, 2004, Head Start unilaterally changed its employees' health insurance provider from Vytra to United Health Care. It is uncontested that such a change would be permissible under the 1999 CBA. However, the NLRB claims that the 1999 CBA had expired in May 2004, by virtue of the opening of negotiations between the parties to the CBA, which (the NLRB held) stopped operation of the evergreen clause.

In October 2003, Head Start and the Union sat down for negotiations. The NLRB found that the parties were negotiating for a successor CBA to replace the thrice renewed 1999 CBA; that finding may be baseless, but it is not contested on this appeal.[1] There is no record evidence

---

1. The negotiations cited by the NLRB culminated in a Memorandum of Agreement, dated April 22, 2004. By its terms, the Memorandum of Agreement adjusts employment terms for a period ending in May 2004—a time undisputedly governed by the renewed 1999 CBA. The Memorandum of Agreement, therefore, only evinces negotiations over retroactive modifications; not over a new CBA. The NLRB concedes: "Rather than constituting a successor agreement, the Memorandum was at most only a document that *cleaned up and partially modified retroactively certain terms* of the then-current and past agreements." Appellee Br. at 23 (emphasis added). The Memorandum of Agreement also committed the parties "to *commence* negotiations for a successor Collective Bargaining Agreement as soon as practicable at mutually agreeable dates and times." Appx. at 160 (emphasis added). This would seem to say that negotiations over a new agreement had not yet then begun. This interpretation is reinforced by witness testimony before the NLRB that nego-

that Head Start's exclusive control over selection of a health benefit plan was a subject of the negotiations. At no point did either party express an intent to suspend the operation of the evergreen clause. ·

The parties reduced their talks to a Memorandum of Agreement that would take force upon ratification by the parties. This agreement left intact Head Start's unilateral control over health care decisions: "[A]ll current practices ... regarding personnel as set forth in the Agency's Personnel Policies and Procedures Manual shall remain in effect except where modified by this agreement."

In a September 2005 decision and order, the NLRB concluded that by commencing those negotiations, the "parties waive[d] contractual requirements of timely or written notice of termination or modification," thereby disabling the evergreen clause. The NLRB concluded therefore that Head Start violated its obligation to bargain in good faith by unilaterally changing health benefits after the May 2004 termination of the CBA.

## DISCUSSION

The question presented is whether the NLRB has adequately established that the conduct of negotiations alone—and absent any manifestation of an intent to terminate a CBA—stops the operation of an automatic-renewal evergreen clause.

## I

■■■ Congress has "delegat[ed] to the [National Labor Relations] Board [ ] the primary responsibility of marking out the scope ... of the statutory duty to bar-

gain." *Ford Motor Co. v. NLRB,* ·441 U.S. 488, 496, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). Consequentially, we uphold the NLRB's findings of fact if supported by substantial evidence, *Universal· Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and the NLRB's legal determinations if not "arbitrary and capricious." *Laborers' Int'l Union of N. Am., AFL–CIO, Local 104 v. NLRB,* 945 F.2d 55, 58 (2d Cir.1991). Our review is deferential: "This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law. In so doing, we afford the Board 'a degree of legal leeway.' " *NLRB v. Caval Tool Div., Chromalloy Gas Turbine Corp.,* 262 F.3d 184, 188 (2d Cir.2001) (quoting *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 89–90, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995)).

■■■ .However, while the "standard is narrow and a court is not to substitute its judgment for that of the agency[,] the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks and citations omitted); *see also New Eng. Health Care Employees· Union, Dist. 1199 v. NLRB,* 448 F.3d 189, 194 (2d Cir.2006) (applying *State Farm* "hard look" standard to NLRB adjudication). Our "hard look" will also examine whether an agency decision accurately reflects its own caselaw: "[T]he consistency of an agency's position

tiations over a successor CBA did not begin until October 2004. The NLRB's ruling could not be enforced absent substantial evidence supporting the finding that Head Start had conducted negotiations over a successor agreement. At oral argument, however, Head Start conceded that the negotiations covered a new agreement; so we will not examine whether the record supports the NLRB's finding that a successor agreement was under negotiation when Head Start unilaterally switched health insurers.

is a factor in assessing the weight that position is due." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Likewise, under *State Farm*, an agency explanation will not be afforded deference unless the agency has considered all relevant issues and factors. 463 U.S. at 48–49, 103 S.Ct. 2856.

## II

■■■ Health benefits are a subject of mandatory bargaining: Absent a contrary CBA provision on point, a union's health benefits may not be changed by management except as the result of bargaining. *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 68 & n. 2 (2d Cir.1979).[2] Therefore, except insofar as a CBA grants management discretion over health benefits, a unilateral change violates the duty to bargain. It is uncontested that the 1999 CBA vested such discretion in Head Start. If the relevant provision of the 1999 CBA was still in force when Head Start switched health insurance carriers, the switch breached no duty to bargain. Unless the 1999 CBA was somehow terminated, it was renewed and in force.

The Board ruled that the 1999 CBA was terminated as a result of negotiations between the parties over a new CBA. The NLRB cited to three agency cases—*Lou's Produce, Inc. v. General Truck Drivers*, 308 N.L.R.B. 1194 (1992), *Big Sky Loca-*

*tors, Inc.*, 344 N.L.R.B. No. 15 (2005), and *Drew Division v. Teamsters*, 336 N.L.R.B. 477 (2001)—as the only support for the proposition that a party need not communicate notice of intent to terminate when that party is negotiating over a successor CBA; the board presented no independent policy justification or legal analysis in support of this proposition. As demonstrated below, however, while NLRB caselaw does indeed relieve parties of the forms and conditions of notice, no cited case supports the proposition on which the NLRB decided this case: That, once negotiations are ongoing, a CBA can be terminated without any expression of intent by either party.[3]

The cited cases apply a rule introduced in a fourth case, *Ship Shape Maint. Co. v. Bldg. Serv. Employees Int'l Union, Local 82, AFL–CIO*, 187 N.L.R.B. 289 (1970). The CBA at issue in *Ship Shape* would automatically renew absent notice given 60 days before the expiration date. The union gave the employer notice of its desire to terminate 59 days before the expiration. *Id.* at 291 & n. 4. However, before the 60–day mark, the union and the employer had begun (and by some accounts, concluded) negotiations over wages. The NLRB adopted the finding of the administrative law judge ("ALJ") that a company that has "already commenced negotiations 75 days before the expiration date, waived the contractual requirement *for a 60–day written notice.*" *Id.* at 291 (emphasis added).

2. This Court has held that the designation of the particular health insurance carrier is *not* a mandatory bargaining subject, so long as the parties have negotiated over the "benefits, coverage and administration of the plan." *Connecticut Light & Power Co. v. NLRB*, 476 F.2d 1079, 1083 (2d Cir.1973). However, Head Start does not dispute that its carrier switch would have been a subject for mandatory bargaining but for the 1999 CBA. Accordingly, we will treat the switch at issue as the type of case foreshadowed by *Connecticut Light,* in which "the identity of the insurance

carrier itself vitally affects the terms and conditions of the employment," and is therefore a proper subject for mandatory bargaining. *Id.*

3. This Court has not considered whether the cases relied on by the NLRB reasonably apply the Board's governing statutes. Because the cases were misapplied to the circumstances of this case, we do not comment on whether the cases are otherwise premised on reasonable statutory constructions.

*Ship Shape* stands for the proposition that ongoing negotiations suspend the forms and conditions of notice (timeliness and a writing); but the case does not speak to whether *the conduct* of negotiations dispenses with the need for *any* manifested notice of intent to terminate.

The cases cited by the NLRB do not expand the scope of the *Ship Shape* rule. In *Lou's Produce,* a CBA with a rollover clause expired while negotiations were ongoing. The union declared the contract to have been automatically renewed, pursuant to the rollover clause. The ALJ decided that the union acted in bad faith by invoking the rollover clause while negotiations were ongoing. *Lou's Produce,* 308 N.L.R.B. at 1200 n. 4 (stating, in a case with no notice, that "if the parties actually begin bargaining before the contract expires, they will be deemed to have waived the requirements that the notice of termination *be in writing or that it be timely*" (emphasis added)). The NLRB reversed: "[W]e find no merit to the Respondent's assertion that the Union engaged in bad faith bargaining by stating ... that the parties' contract had been automatically renewed." *Id.* at 1195. Likewise, the Board decision in *Big Sky* did not develop the agency's position on operation of an evergreen clause: While the ALJ discussed evergreen clauses, an alternative holding of the NLRB mooted the need for an agency ruling on the automatic-rollover issue. *Big Sky Locators, Inc.,* 344 N.L.R.B. No. 15, at *2 n. 2 ("Because we have affirmed the [ALJ's] conclusion that the parties had a ... bargaining relationship, we find that the issue of the contract's termination is no longer before the Board.").

The third case, *Drew Division,* simply restates the rule of *Ship Shape.* The union's written notice of intent to terminate was untimely under the rollover clause.

336 N.L.R.B. at 478. The employer announced that it considered the contract renewed. Without commenting on the necessity of some type of notice, the NLRB applied *Lou's Produce* and *Ship Shape* and held that negotiations relax the *formalities* of notice:

> [T]hough the Union's notice of proposed termination of the contract was untimely[,] Respondent [ ] *waived the untimeliness* of the notice.... "[I]f the parties actually begin bargaining before the contract expires, they will be deemed to have waived the requirements that the notice of termination *be in writing or that it be timely.*"

*Id.* at 481 (emphasis added) (quoting *Lou's Produce,* 308 N.L.R.B. at 1200 n. 4).

Relief from the requirements of writing and timeliness does not bespeak relief from the requirement of notice altogether. Reliance on these Board decisions alone therefore cannot satisfy the reasoned-decision requirement of *State Farm;* the NLRB decision wholly failed to explain why the rule granting relief from the formalities of notice should be extended to grant relief from notice altogether.

On this appeal, the NLRB posits that the onset of negotiations constructively communicates an intent to terminate the contract: "By commencing negotiations for a new agreement, the parties here ... *effectively indicated* that they did not intend the expired contract to renew automatically." Appellee Br. at 17. Even if this new rationale were more compelling than it seems to be, the NLRB may not advance this theory for the first time on judicial review. *See SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). In any event, the

NLRB's position on appeal asserts cause-and-effect without specifying the principle of causation. This is not enough to justify termination of a CBA as of a time when both parties may have wished it to continue—especially since many negotiations (over CBAs and other contracts) result in nothing more than incremental amendments to existing agreements. If the NLRB wishes to adopt such a rule or presumption, it must explain its logic. The caselaw cited in the NLRB decision reflects a different policy logic than the rule proposed on appeal. If CBA language demanding timely notice was strictly enforced, parties who attempted negotiation in lieu of outright termination might find themselves trapped in a disfavored CBA by prolonged negotiations. The NLRB's precedents relieve parties of that risk, so that they need not choose at the outset between negotiation and escape. The cases thus remove a cost of negotiation; but they do not equate negotiation with exasperation over a current contract. The NLRB's opinion—which wholly fails to recognize this distinction—does not satisfy *State Farm*.

Because the Board has failed to present either a well-reasoned explanation for its rule or an analysis of all relevant issues, the NLRB's decision does not satisfy the *State Farm* requirements for reasoned agency decision making. Accordingly, we vacate and remand.

\* \* \*

For the foregoing reasons, the petition for review is granted, the cross-petition for enforcement is denied, the decision and order of the NLRB is vacated, and the case is remanded to the NLRB for future proceedings consistent with this opinion.