10-3616-ag
SEIU v. NLRB

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Submitted: April 26, 2011                    Decided: August 1, 2011)

Docket No. 10-3616-ag
_____

SERVICE EMPLOYEES INTERNATIONAL UNION, Local 32BJ

*Petitioner*,

*-v.-*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*.

_____

Before:

KEARSE, SACK, HALL, *Circuit Judges.*
_____

Petitioner Service Employees International Union, Local 32BJ ("Local 32BJ" or the

"Union") seeks review of three decisions of the National Labor Relations Board ("NLRB" or the

"Board") affirming in part and reversing in part the Administrative Law Judge's findings with

respect to allegations that AM Property Holding Corporation ("AM") participated in a scheme

with two successive cleaning contractors, Planned Building Services, Inc. ("PBS"), and Servco

Industries, Inc. ("Servco"), to avoid a bargaining obligation with the Union after AM purchased

1

a building located at 80 Maiden Lane in Manhattan, New York City. Local 32BJ argues that the NLRB erred by finding that: (1) AM was not a joint employer with either PBS or Servco; (2) the Board was precluded from determining whether PBS was individually a successor employer to Clean-Right, the in-house cleaning division of the former owner of 80 Maiden Lane, because the General Counsel had not litigated a violation based on that theory; and (3) the Union was not entitled to additional remedies. We reject the first and third claims of error, but conclude that as to the second, the NLRB misunderstood its authority to determine whether PBS was individually a successor employer to Clean-Right and, thus we remand so that the Board may reconsider this issue.

ENFORCED IN PART AND VACATED AND REMANDED IN PART.
_____

Andrew L. Strom, Office of the General Counsel, SEIU Local 32BJ, New York, NY, *for Petitioner*.

Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel (Robert Englehart, Supervisory Attorney, David A. Fleischer, Senior Attorney, *on the brief*), National Labor Relations Board, Washington, D.C., *for Respondent*.

Alan B. Pearl, Alan B. Pearl & Associates, P.C., Syosset, NY, *for Intervenor AM Property Holding Corp.*

Marvin L. Weinberg, Fox Rothschild LLP, Philadelphia, PA, *for Intervenor Planned Building Services, Inc.*

Martin Gringer, Franklin, Gringer & Cohen, P.C., Garden City, NY, *for Intervenor Servco Industries, Inc.*
_____

2

HALL, *Circuit Judge*:

Petitioner Service Employees International Union, Local 32BJ ("Local 32BJ" or the "Union") seeks review of three decisions of the National Labor Relations Board ("NLRB" or "Board") affirming in part and reversing in part the Administrative Law Judge's findings with respect to allegations that AM Property Holding Corporation ("AM") participated in a scheme with two successive cleaning contractors, Planned Building Services, Inc. ("PBS"), and Servco Industries, Inc. ("Servco"), to avoid a bargaining obligation with Local 32BJ after AM purchased a building located at 80 Maiden Lane in Manhattan, New York City. The Union argues on appeal that the NLRB erred by finding that: (1) AM was not a joint employer with either PBS or Servco; (2) the Board was precluded from determining whether PBS was individually a successor employer to Clean-Right, the in-house cleaning division of the former owner of 80 Maiden Lane, because the General Counsel had not litigated a violation based on that theory; and (3) Local 32BJ was not entitled to additional remedies. We conclude that the NLRB adequately addressed its own precedents in finding that AM was not a joint employer with PBS or Servco and that this finding was supported by substantial evidence. We further conclude that the Board did not err by refusing to grant Local 32BJ extraordinary remedies. We hold, however, that the Board misunderstood its authority to determine whether PBS was individually a successor employer of Clean-Right, and thus we remand so that the Board may reconsider this issue.

**BACKGROUND**

I.      Factual Background

The material facts are not in dispute. In April 2000, AM closed on the purchase of an office building at 80 Maiden Lane ("80 Maiden Lane" or the "Building") in Manhattan from The

3

Witkoff Group ("Witkoff"). At the time of the sale, cleaning services for the Building were provided by twelve employees of Clean-Right, an in-house cleaning division of Witkoff. Witkoff was a signatory to a collective bargaining agreement between the Realty Advisory Board on Labor Relations (of which Witkoff was a member) and Local 32BJ, under which Clean-Right's employees earned approximately $16.00 per hour. Immediately following the sale, AM entered into a contract with PBS for cleaning services, which provided that employees would receive wages and benefits specified in a "union collective agreement," under which wages were set at $7.00 and $7.50 per hour. Within a week following the sale, PBS entered into a collective bargaining agreement with the United Workers of America ("UWA") covering the service employees at 80 Maiden Lane and 75 Maiden Lane (a building across the street), the terms of which ran from May 1, 2000 to April 30, 2003.

When Clean-Right's employees appeared for work the day after AM took possession of the Building, they were told they no longer had jobs because PBS was bringing in its own work force. Several days later, a group of Clean-Right employees went to 80 Maiden Lane and gave their names, addresses, and phone numbers to Jack Constantine, an AM official, who told them that he would contact PBS and "see what we could do." Constantine admitted that he did not follow through with PBS.

At AM's request, the contract between it and PBS provided that PBS would retain "one night supervisor @ $10.00/hr., with single health coverage, holidays and sick days," adding that "[a]ny employee that is retained from [AM's] staff *at* [*AM's*] *request* who is receiving wages and/or benefits in excess of those contained with the wage rates structure and benefits within union collective agreement, shall continue to receive said rates differential and/or other

4

benefits." This language was inserted by PBS based on AM's recommendation that it hire Dennis Henry for a "supervisory role" at the Building; Henry had previously been employed by AM as a night porter at 75 Maiden Lane, and was transferred to 80 Maiden Lane following its sale to AM.[1] When Henry first reported for work at the Building, he was told that his duties consisted of preparing the supplies for the cleaning personnel and checking to make sure that their work was completed. This entailed distributing keys and cleaning supplies to employees at the start of a shift, preparing and signing employee time cards, and instructing employees to redo their work if it was not done properly. Although Henry was placed on PBS's payroll incident to his transfer to 80 Maiden Lane, he continued to complain to Paul Wasserman, an AM official, about his wages and benefits, and on at least one occasion, Wasserman contacted PBS and arranged for Henry to receive a wage increase. Based on Henry's repeated complaints, Wasserman transferred Henry back to the AM payroll in July 2000 but his duties at 80 Maiden Lane remained the same.

In July 2000, PBS sent a written offer of employment to Zoila Gonzalez, a former Clean-Right employee. When Gonzalez reported to work at the Building, she was met by Henry, who presented her with a work cart and a mop. Gonzalez protested that she had not previously been required to perform this type of heavy work, and when Henry insisted that she had to mop, Gonzalez claimed she had a medical condition that prevented her from mopping. Henry then told Gonzalez that he had to go to the building office to explain "what was happening." Gonzalez accompanied Henry and waited outside the office, and when Henry emerged a few

---

[1] It is undisputed that Henry did not meet the definition of a "supervisor" under the National Labor Relations Act, 29 U.S.C. § 152(11).

5

minutes later, he explained that if Gonzalez refused to mop, she could not work. Gonzalez testified that she did not know to whom Henry had spoken.

In April 2001, all of the PBS employees at 80 Maiden Lane went on strike. On May 15, 2001, AM sent a letter to PBS terminating its services at the Building effective June 15, 2001, and on May 31, 2001, AM entered into a contract with Servco to provide cleaning services at 80 Maiden Lane. Under the terms of that contract, Servco agreed that AM's "present night supervisor [wa]s to remain as night supervisor and compensated by AM," a provision which, it is undisputed, referred to Henry. On June 14 (while the strike was ongoing, but before Servco took over cleaning operations for 80 Maiden Lane), several PBS workers entered the Building and asked Henry to assist them in obtaining jobs with the new company. Henry told them, however, that "they [i.e., Servco] don't want anyone from the strike." Two of the PBS employees then separately asked for job applications from Constantine, who explained that he could "not do anything" for them because they had "made trouble." A few days later, Constantine gave a similar response to several of the striking PBS employees who had returned to the Building and asked for job applications, stating that it was a "bad decision" that they went on strike, and that striking was "not the best choice."

As for the non-striking PBS employees, Henry instructed them to report to 80 Maiden Lane on June 15 because Servco might offer them employment. When the employees arrived, they were joined by a number of Servco employees who were also applying for positions, and together, they were addressed by Mark Giacoia, Servco's Sales Manager, who warned the employees that "nobody better not fucking talk to the union because if you do, you'll be fired on the spot." Giacoia also told the employees that their salary would be $6 per hour. Henry urged,

6

however, that because the employees had previously been paid $7 per hour by PBS, it would only be fair to continue their salary at that rate. Giacoia indicated that he would consider Henry's suggestion. Ultimately, Servco's President decided to pay the employees $7 per hour, but did not consult Henry in making this decision. After Servco took over operations at 80 Maiden Lane, Henry recommended that it retain certain employees. Servco later interviewed those employees and made its own hiring decisions.

II.     Procedural History

In 2000 and 2001, Local 32BJ filed a series of unfair labor practice charges against PBS, AM, and Servco. Among other charges, the Union alleged that PBS and AM, as joint employers, violated Sections 8(a)(1), (2), (3), and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (2), (3), and (5), by discriminating against Building service employees previously represented by Local 32BJ at 80 Maiden Lane to avoid successorship bargaining obligations; AM violated Sections 8(a)(1) and (3) of the Act by terminating Building service workers employed at 80 Maiden Lane in retaliation for their union activity; and AM and Servco, as joint employers, violated Sections 8(a)(1), (3), and (5) of the Act by refusing to hire Building service workers in retaliation for their union activity and for refusing to recognize and bargain with Local 32BJ. In March 2001, the NLRB began issuing complaints relating to these allegations, and the consolidated cases were heard before an Administrative Law Judge ("ALJ") in 2002. The ALJ found, *inter alia*, that (1) AM and PBS were joint employers with respect to the 80 Maiden Lane employees, (2) AM and Servco were joint employers with respect to those same employees, and (3) AM and PBS were successor employers to Clean-Right and had a duty

to bargain with Local 32BJ. Each party filed exceptions to the decision, and Local 32BJ sought additional remedies against PBS.

In August 2007, a divided NLRB panel reversed in part the ALJ's decision.[2] *See AM Prop. Holding Corp.*, 350 N.L.R.B. 998 (2007). The Board found there was insufficient evidence that AM exercised control over PBS's hiring and firing decisions or directed extensively the work of PBS employees so as to establish that AM and PBS were joint employers. In addition, the Board found that AM's role in overseeing Servco employees and recommending wage rates and employees for hire was similarly insufficient to establish that AM and Servco were joint employers. Given its reversal of the ALJ's joint employer finding, the Board also determined that AM and PBS were not joint successors to Clean-Right, but the Board held that it was "precluded from considering whether either AM or PBS individually was a successor to Clean-Right with an obligation to recognize 32BJ because the General Counsel has not litigated a violation based on that theory." Finally, the NLRB declined the Union's request to order extraordinary remedies, finding that PBS's conduct was not "so numerous, pervasive, and outrageous" as to warrant this relief.

Local 32BJ moved for reconsideration of the Board's refusal to consider whether PBS was an independent successor to Clean-Right and of the Board's denial of extraordinary remedies. In March 2008, a two-member group of the NLRB denied the motion, after which the Union petitioned this Court for review of both agency decisions. *See AM Prop. Holding Corp.*, 352 N.L.R.B. 279 (2008). Following the Supreme Court's decision in *New Process Steel, L.P. v.*

---

[2] The NLRB affirmed the majority of the ALJ's findings with respect to AM's, PBS's, and Servco's individual violations of the Act, none of which are relevant to this appeal. NLRB Member Liebman concurred in part and dissented in part in the decision.

*NLRB*, 130 S. Ct. 2635 (2010) (holding that a delegee group of the NLRB could not continue to exercise its delegated authority once the group's and the NLRB's membership was reduced to two members), we remanded to the agency, and in 2010, a properly constituted NLRB panel affirmed the agency's March 2008 decision for the reasons stated therein. *See AM Prop. Holding Corp.*, 355 N.L.R.B. No. 151 (2010). Jurisdiction was subsequently returned to this Panel of this Court pursuant to the procedures set forth in *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).[3]

**DISCUSSION**

I. Joint-Employer Status

Local 32BJ challenges the Board's legal conclusions and its factual findings regarding whether AM was a joint employer with either PBS or Servco. First, the Union asserts that while the Board applied the correct legal standard, it failed to distinguish or overrule prior decisions in which the agency found a joint employer relationship based on facts similar to the instant case. Second, the Union contends that the Board's factual findings are flawed.

i. The Board's Legal Analysis

In general, our review of the Board's legal conclusions is "deferential." *Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 257 (2d Cir. 2006); *see NLRB v. Caval Tool Div.*, 262 F.3d 184, 188 (2d Cir. 2001) ("This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law. In so doing, we afford the Board 'a degree of legal leeway.'" (quoting *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995))). That

---

[3] The parties have stipulated to resubmit this appeal to this Panel for decision based on their previously filed briefs and oral argument held on April 22, 2009. As in the original appeal, AM, PBS, and Servco appear as intervenors.

said, "'the agency must examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Long Island Head Start*, 460 F.3d at 257 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). For this reason, we will "examine whether an agency decision accurately reflects its own caselaw." *Id.* (internal quotation marks omitted) Where the Board "departs from prior interpretations of the Act without explaining why that departure is necessary or appropriate," the Board will have exceeded the bounds of its discretion. *District Lodge 91, Int'l Ass'n of Machinists and Aerospace Workers AFL-CIO v. NLRB*, 814 F.2d 876, 879 (2d Cir. 1987); *see also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due.").

"[A]n essential element" of any joint employer determination is "sufficient evidence of immediate control over the employees," *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985)—namely, "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process," *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995) (citing *Clinton's Ditch Co-op*, 778 F.2d at 138-39); *see also Laerco Transp. & Warehouse*, 269 N.L.R.B. 324, 325 (1984) (finding that to establish a joint employer relationship, there must be evidence that one employer "meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction" of the other entity's employees). Local 32BJ does not dispute that the Board applied this standard. Rather, it contends that in analyzing two of these factors—supervision and hiring—the Board failed to address contrary precedent.

10

Local 32BJ asserts that in finding Henry's supervisory responsibilities vis-a-vis the PBS and Servco employees did not demonstrate that AM was a joint employer with those companies, the Board articulated a "new rule that represents a significant departure from settled law" and is inconsistent with agency precedent. We disagree. In its analysis of Henry's responsibilities, the Board reasoned that "evidence of supervision which is 'limited and routine' in nature does not support a joint employer finding," noting that it had "generally found supervision to be limited and routine where a supervisor's instructions consist primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work." *AM Prop. Holding Corp.*, 350 N.L.R.B. at 1001 (citing *G. Wes Ltd. Co.*, 309 N.L.R.B. 225, 226 (1992); *Island Creek Coal Co.*, 279 N.L.R.B. 858, 864 (1986)). This is not a "new rule." The cases the Board relied on broadly support the proposition that "limited and routine" supervision, *G. Wes Ltd.*, 309 N.L.R.B. at 226, consisting of "directions of where to do a job rather than how to do the job and the manner in which to perform the work," *Island Creek Coal*, 279 N.L.R.B. at 864, is typically insufficient to create a joint employer relationship. *See also Local 254, Serv. Emps. Intern. Union, ALF-CIO*, 324 N.L.R.B. 743, 746-49 (1997) (no joint employer relationship where employer regularly directed maintenance employees to perform specific tasks at particular times but did not instruct employees how to perform their work); *S. Cal. Gas Co.*, 302 N.L.R.B. 456, 461-62 (1991) (employer's direction of porters and janitors insufficient to establish joint employer relationship where employer did not, *inter alia*, affect wages or benefits, or hire or fire employees).

Local 32BJ counters that these cases are distinguishable and that the Board erred by not following the precedents of other cases where it found a joint employer relationship despite

11

evidence that the putative employer did not instruct employees how to perform their work.

Although we recognize certain factual distinctions between the present case and those cited by

the Board, its reliance on those cases does not evidence an abuse of discretion. Far from

announcing a categorical rule based on the prior decisions it cited, the Board made the

observation that supervision which does not include instructions on how to perform work is

*generally* insufficient to establish a joint employer relationship, a proposition roundly supported

by those cases. *See AM Holding Prop. Corp.*, 350 N.L.R.B. at 1001. The decisions cited by

Local 32BJ in its brief constitute an exception to this general proposition, and in the vast

majority of those cases, the Board's joint employer finding was based on other circumstances not

present here.[4] In any event, the Board's finding that the extent of Henry's responsibilities was

insufficient to establish a joint employer relationship did not rest exclusively on the nature of the

instructions he gave to the PBS employees. *See id.* The Board emphasized in addition that

---

[4] Local 32BJ relies principally on three cases, all of which are distinguishable (and none of which, we note, the ALJ relied on in his decision). In *In re Lodgian, Inc.*, 332 N.L.R.B. 1246, 1246 n.1, 1248-49 (2000), the Board did not review the Regional Director's finding that the respondent was a joint employer (a finding as to which the union originally took no position), but in any event, that finding did not rest exclusively on the extent of the respondent's supervision of the contractors' employees. Instead, the Regional Director noted as well that the contractors' employees performed the same duties, wore the same uniforms, and shared the same facilities as the employees directly employed by the respondent. *See id.* at 1248-49. In *Holyoke Visiting Nurses Ass'n*, 310 N.L.R.B. 684, 685-86, *enforced* 11 F.3d 302 (1st Cir. 1993), the Board affirmed the ALJ's joint employer finding in part because the respondent had the right to refuse the services of particular contract employees and could even recommend the removal of those employees—facts absent from the record here. Finally, in *DiMucci Construction Co.*, 311 N.L.R.B. 413, 417-18 (1993), *enforced* 24 F.3d 949 (7th Cir. 1994), the Board affirmed the ALJ's joint employer finding based on the fact that while the superintendent of one respondent may not have instructed employees of another respondent in the technical operation of excavation equipment, he directed them as to where they should work and what they should accomplish and also gave detailed instructions regarding "engineering stakes, grades, and elevation." This level of supervision exceeds the scope of Henry's responsibilities vis-a-vis the PBS and Servco employees.

Henry did not train the employees, he could not assign overtime work without PBS's consent, and the employees could refuse overtime work—all of which, in aggregate, demonstrated that Henry's role was insufficient in scope and authority to prove the existence of a joint employer relationship. *See id.* at 1038 n.9 (citing *Computer Assocs. Int'l, Inc.*, 332 N.L.R.B. 1166, 1169 (2000) (recognizing that the employer's independent authorization of overtime for employees of another company was a "strong factor to establish joint-employer status"), *enforcement denied in part by* 282 F.3d 849 (D.C. Cir. 2002)). In sum, the Board did not abuse its discretion by analyzing this issue as it did.

Local 32BJ also argues that in analyzing whether AM's role in PBS's hiring of employees evidenced a joint employer relationship, the Board failed to address its decision in *Le Rendevous Restaurant ("Le Rendevous II")*, 332 N.L.R.B. 336 (2000). We find that case to be distinguishable. In *Le Rendevous Restaurant*, the Ambassador Plaza Hotel & Casino (the "Hotel") decided to subcontract operation of the hotel restaurant to Bultman Enterprises, Inc. ("Bultman") as a means to reduce operating costs. *See Le Rendevous Restaurant ("Le Rendevous I")*, 323 N.L.R.B. 445, 449 (1997).[5] Prior to Bultman's acquisition of the restaurant, its workforce was unionized, and based on an economic analysis of the restaurant's earnings, the most significant factor affecting profitability was high labor costs. *See id.* at 449-50. Against this backdrop, the record contained concrete evidence—including detailed memoranda between representatives of the two companies—that confirmed an explicit agreement to purge the workplace of union personnel and to insulate Bultman's new hires from the Hotel's other unionized employees. *See id.* at 450-51. To this end, evidence showed that the Hotel had

---

[5] Although the Board's joint employer finding appears in *Le Rendevous II*, 332 N.L.R.B. at 336, the facts supporting its analysis are set forth in *Le Rendevous I*, 323 N.L.R.B. at 449-55.

expressly identified which employees had been "contaminated" by their union activities, thus providing notice to Bultman that these employees should not be retained if a nonunion workforce was to be realized. *See id.* at 451. Based on this and other evidence, the Board found a joint employer relationship between the two companies. *See Le Rendevous II*, 332 N.L.R.B. at 336-37.

Contrary to the above, there is no record evidence here of any express agreement between AM and PBS not to hire the Clean-Right employees. Moreover, the nature of the relationship between the two companies is markedly different from that of the Hotel and Bultman. *See Le Rendevous I*, 323 N.L.R.B. at 449-51. Whereas the Hotel had originally operated the restaurant itself and then subcontracted operations to Bultman, AM was never directly involved in providing cleaning services at 80 Maiden Lane; rather, it contracted with PBS to provide those services simultaneous with its purchase of the building. Thus, we reject the Union's assertion that AM's role with respect to PBS's hiring of employees was "just like the role played by the hotel operator in *Le Rendevous II*." Given these factual distinctions, the Board did not abuse its discretion by omitting that case from its analysis of whether AM was a joint employer with PBS.

> ii. The Board's Findings of Fact

The Board's determination as to the existence of a joint employer relationship, which is "essentially a factual issue, . . . cannot be disturbed if it is supported by substantial evidence in the record as a whole." *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) (*per curiam*) (internal quotation marks and citation omitted); *see* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record

14

considered as a whole shall be conclusive.").  Under substantial evidence review, "our inquiry is limited to 'determin[ing] whether the supporting evidence, even if not preponderating in this court's view, nevertheless provides a sufficient basis for the Board's decision.'"  *Unite Here v. NLRB*, 546 F.3d 239, 242 (2d Cir. 2008) (quoting *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967)) (alteration in *Unite Here*).

Local 32BJ alleges two errors with the Board's factual findings.  First, it argues the Board erred by finding that the incident between Dennis Henry and Zoila Gonzalez did not demonstrate AM's involvement in PBS's hiring decisions.  The record indicates that when Gonzalez explained to Henry that her medical condition prevented her from mopping, Henry went to the building office to explain "what was happening," and when he emerged from the office a few minutes later, he told Gonzalez that if she refused to mop, she could not work.  While the ALJ acknowledged that, based on these facts, "there was no evidence as to who, if anyone, Henry spoke to," he found nonetheless that "a fair inference may be drawn that AM building manager Constantine or his designee made the decision to present the ultimatum to Gonzalez that she must mop or else not be hired."  *AM Prop. Holding Corp.*, 350 N.L.R.B. at 1038.  The Board reversed, finding "there [wa]s no evidence that an AM official vetoed Gonzalez'[s] hire."  *Id.* at 1000.

We disagree with the Union and conclude that the Board's finding was supported by substantial evidence.  The ALJ's finding that AM vetoed Gonzalez's hiring rested on the attenuated assumption that: (1) Henry spoke to some person in the building office; (2) that person occupied a position of authority at AM; and (3) that same person instructed Henry to veto Gonzalez's employment application.  But because there is no evidence in the record that Henry

15

spoke to *anyone* in the office, these inferences are unsupported.  The Union further contends that the Board's reversal of the ALJ's finding on this point violated *Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) ("When the Board purports to be engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands."), but we reject this argument for the reasons we have stated.  Because the record failed to show that Henry spoke to anyone, it cannot be said that the evidence "fairly demand[ed]" the ALJ's inference that AM vetoed Gonzalez's hiring. *Id.*

Second, Local 32BJ challenges the Board's finding that AM was not involved in ensuring that Servco did not hire the striking PBS employees, asserting that Constantine's and Henry's statements to those employees support a finding of a joint employer relationship.  We are not convinced.  Although there is no question that Constantine and Henry told the employees they were ineligible for employment because of their participation in the strike, we agree with the Board that "there [wa]s no evidence that Servco had authorized either Constantine or Henry to make any representations on it[s] behalf, or that Servco had involved them in its hiring process." *AM Prop. Holding Corp.*, 350 N.L.R.B. at 1002.  Indeed, as the Board noted, *see id.*, these circumstances are easily distinguishable from *Le Rendevous Restaurant II*, 332 N.L.R.B. 336, where there was explicit evidence of coordination between the Hotel and the restaurant concerning the hiring of a nonunion workforce—facts noticeably absent from the record in this case, *see supra* at 13-14.

For the foregoing reasons, we conclude that the Board's factual findings are supported by substantial evidence.

II.     Successorship

As noted above, the Board determined that it lacked the authority to consider whether PBS was individually a successor employer to Clean-Right (and thus had an obligation to bargain with Local 32BJ) "because the General Counsel ha[d] not litigated a violation based on that theory." *AM Prop. Holding Corp.*, 350 N.L.R.B. at 1003; *see also AM Prop. Holding Corp.*, 352 N.L.R.B. at 281 n.8 (denying the Union's motion for reconsideration on this issue because "[t]he General Counsel frames the theory of the case, and the Charging Party may not enlarge upon or change the General Counsel's theory").  The Board reasoned, as well, that the "key question" in deciding the merits of this issue was whether the PBS employees at 80 Maiden Lane constituted an appropriate bargaining unit, but that the General Counsel had not established or even alleged this fact.  *See AM Prop. Holding Corp.*, 350 N.L.R.B. at 1003.  Local 32BJ challenges this determination.  38-39]  It asserts that under *Pergament United Sales*, 296 N.L.R.B. 333, 334 (1989), *enforced* 920 F.2d 130 (2d Cir. 1990), the Board was not precluded from finding that PBS was an individual successor to Clean-Right, and that the General Counsel need not have established the appropriateness of the bargaining unit because the unit consisting of the 80 Maiden Lane employees was presumptively appropriate.

*Pergament* addressed whether the Board could find a violation of the Act that had not been alleged in either the charge or the General Counsel's complaint.  *See id.* at 334.  Underlying this question was the concern that, to comport with due process, "the NLRB may not find that an unfair practice exists without first affording the alleged violator notice and an opportunity for a

17

hearing," which, as to the former, requires ordinarily that the complaint "contain notice of the particular violations charged." *N.L.R.B. v. Coca Cola Bottling Co. of Buffalo, Inc.*, 811 F.2d 82, 87 (2d Cir. 1987); *see Pergament*, 920 F.2d at 134 ("Due process requires the Board to afford an alleged violator notice and an opportunity for a hearing on a charge under the Act[.]"). To account for this concern, the Board held that it "may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated."[6] *Pergament*, 296 N.L.R.B. at 334.

Over time, the Board has applied this rule to a variety of circumstances. *See*, *e.g.*, *Ernst Home Ctrs., Inc.*, 308 N.L.R.B. 848, 849-50 (1992) (affirming, based on this rule, the ALJ's finding of a violation even though it was not alleged in the complaint and was based on a theory different from that advanced by the General Counsel); *Denholme & Mohr, Inc.*, 292 N.L.R.B. 61, 61 n.1 (1988) (affirming, based on this rule, the ALJ's finding of an unfair labor practice violation concerning a worker who was not identified in the complaint and who the General Counsel stated was not involved in the case); *see also In re Sierra Bullets, LLC*, 340 N.L.R.B. 242, 242-43 (2003) (reversing the ALJ's finding of a violation on a theory not advanced by the General Counsel because the respondent was not given sufficient notice that the issue would be

[6] Although this reasoning predates *Pergament*, we rely principally on that decision because it contains the clearest articulation of the rule. *See*, *e.g.*, *Coca Cola Bottling Co.*, 811 F.2d at 87 ("[An] uncharged violation may only be found by the ALJ if all issues surrounding the violation have been litigated fully and fairly."); *The Baytown Sun*, 255 N.L.R.B. 154, 154 n.1 (1981) (finding no prejudice in ALJ's finding of a violation not alleged in the complaint because the issue had been fully and fairly litigated); *Crown Zellerbach Corp.*, 225 N.L.R.B. 911, 912 (1976) ("[B]ecause the issue was fully litigated and is intimately related to the subject matter of the complaint, we shall find and remedy this unlawful conduct even though it is not specifically alleged to be an unfair labor practice in the complaint."); *cf. NLRB v. Am. Tube Bending Co.*, 205 F.2d 45, 46 (2d Cir. 1953) (L. Hand, *J.*) (holding that an employer was not entitled to a rehearing before the Board concerning a violation found by the ALJ that had not been charged in the complaint and that had not been considered or argued by either party).

litigated so as to comport with due process). Indeed, in *Enloe Medical Center*, 345 N.L.R.B. 874

(2005), the Board reversed the ALJ and, *sua sponte*, identified a violation of the Act on a theory

not alleged in the complaint or advanced by the General Counsel. *See id.* at 877-78. On the

respondent's motion for reconsideration, however, the Board held that because the violation had

not been fully and fairly litigated, it would remand to the ALJ to provide the respondent an

opportunity to litigate the issue. *See Enloe Med. Ctr.*, 346 N.L.R.B. 854, 855-56 (2006).

These cases demonstrate that the Board *may* identify a violation of the Act that was not

specifically alleged in the complaint or advanced by the General Counsel *if* the parties had

sufficient notice to satisfy due process—i.e., "if the issue [wa]s closely connected to the subject

matter of the complaint and has been fully litigated." *Pergament*, 296 N.L.R.B. at 334. Here,

the Board erred because it assumed, without analysis, that because the General Counsel had not

litigated a violation based on the theory that PBS was individually a successor to Clean-Right,

due process concerns *necessarily* barred it from reaching this issue. The Board made no

determination, however, as to whether these concerns were *in fact* implicated in this particular

case. This was incorrect.[7] *See Pergament*, 920 F.2d at 136 (rejecting argument that Board

---

[7] We emphasize that the Union is *not* asking this Court to rule in the first instance that PBS was in fact an individual successor to Clean-Right, which we may not do. *See Williams v. NLRB*, 105 F.3d 787, 790 n.3 (2d Cir. 1996) ("Williams asks this court to consider the validity of the union-security clause itself. This we cannot do, as the issue is not properly before us.") (citing, e.g., *Wellington Mill Div., W. Point Mfg. Co. v. NLRB*, 330 F.2d 579, 591 (4th Cir. 1964) ("The Union asks this court's judgment on the merits of a matter never properly put in issue and not passed upon by the Board. Its request must be denied. A court has no power to order the General Counsel to issue a complaint and no power to require the Board to issue an order in a matter which is not before it.")). Instead, Local 32BJ asks us to consider whether the Board misunderstood *its* authority to find a violation that was not specifically alleged in the charge or the complaint, and under *Pergament*, the Board has such authority provided "the issue [wa]s closely connected to the subject matter of the complaint and has been fully litigated." *Pergament*, 296 N.L.R.B. at 334.

findings based on uncharged violations necessarily violate due process, since the operative question in such circumstances is whether the uncharged violation was fully and fairly litigated). Under *Pergament* and related cases, the Board should have determined, based on the facts in the record, whether the issue of PBS's status as an individual successor to Clean-Right had been fully litigated and was sufficiently related to the underlying complaint such that finding a violation on that ground would comport with due process. *See Pergament*, 920 F.2d at 136 ("[W]hether a charge has been fully and fairly litigated [to satisfy due process] is so peculiarly fact-bound as to make every case unique; [this] determination . . . must therefore be made on the record in each case."). That this issue was not alleged in the Union's complaint or advanced by the General Counsel was not, in and of itself, dispositive.

As to the merits of whether PBS was an individual successor to Clean-Right, central to a finding of legal successorship "is whether the bargaining unit that the union seeks to represent remains 'appropriate' under the successor's operations." *Banknote Corp. of Am. v. NLRB*, 84 F.3d 637, 642 (2d Cir. 1996). A successor employer must recognize and negotiate with the union of its predecessor's employees if, under the successor employer's operations, the bargaining unit remains an appropriate representative of that group of employees "and the successor does not have a good faith doubt of the union's continuing majority support." *See Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 114 (D.C. Cir. 1996) (citing, e.g., *Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27, 36-37 (1987)). However, if the successor employer's operational structure and practices differ in significant regard from those of its predecessor, the bargaining unit may no longer be the appropriate representative, and that fact would likely

relieve the successor employer of an obligation to bargain with the union. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280 (1972).

Here, PBS provided cleaning services at locations other than 80 Maiden Lane when it took over operations at that facility. The question arises, then, as to whether the bargaining unit consisting solely of employees who were at the 80 Maiden Lane location—the unit was subject to collective bargaining agreement between Local 32BJ and Clean-Right—can still be an appropriate representative of those employees given the differences between PBS's and Clean-Right's operational structures. The Board held that the General Counsel failed to establish whether the bargaining unit continued to be appropriate and thus refrained from determining whether PBS was a successor to Clean-Right. *See AM Prop. Holding Corp.*, 350 N.L.R.B. at 1003. Local 32BJ contends, however, that under the Board's so-called "single location unit" presumption, the PBS employees at 80 Maiden Lane continued to constitute an appropriate bargaining unit because they worked in one place at a facility separate from other work locations where PBS had employees.

When faced with the question of the appropriateness of a particular bargaining unit, the Board has long treated a unit limited to a single facility as presumptively appropriate. *Orkin Exterminating Co.*, 258 N.L.R.B. 773, 773 (1981) ("When considering a multifacility operation, the well-established Board policy is to find a single-facility unit presumptively appropriate."); *accord NLRB v. HeartShare Human Servs. of N.Y., Inc.*, 108 F.3d 467, 471 (2d Cir. 1997) ("When selecting an appropriate bargaining unit, the NLRB employs the so-called single-facility presumption, that employees in a separate facility of a multi-facility operation should be presumptively treated as a separate bargaining unit." (internal quotation marks omitted)). The

21

burden falls on the successor employer to rebut this presumption, which can be accomplished by showing that, *inter alia*, the functional integration between the single facility and the successor's other operations is "so substantial as to negate the separate identify of the single-facility unit." *Orkin Exterminating Co.*, 258 N.L.R.B. at 773; *see also Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1085 (D.C. Cir. 2003) (holding that the single-facility presumption can be rebutted by a showing of "functional integration," among other factors). Here, although PBS provided cleaning services at multiple locations, the employees at 80 Maiden Lane all worked at a single (and separate) facility. We see no reason why the Board—consistent with well-established policy—should not have presumed, therefore, that those employees constituted an appropriate bargaining unit. *See HeartShare Human Servs.*, 108 F.3d at 471. That the General Counsel had not alleged or established this fact affirmatively should have been immaterial to the Board's determination of whether PBS was a successor to Clean-Right.

Accordingly, we remand so that the Board can consider in the first instance whether PBS was an individual successor to Clean-Right and whether—based on the particular facts in this case—reaching this issue would comport with due process. In so doing, the Board should apply its single-facility presumption or articulate why this presumption is inapplicable. And if the Board finds that due process concerns do preclude it from reaching this issue, it should determine whether remand is appropriate under *Enloe*, 346 N.L.R.B. at 855-56 (remanding to the ALJ to provide the Respondent with an opportunity to litigate a potential violation of the Act so as to remedy any prejudice the Respondent might have suffered by the Board identifying a violation on a theory not alleged in the complaint or advanced by the General Counsel).

III.     Extraordinary Remedies

22

We review for abuse of discretion the Board's decision not to impose extraordinary remedies. *See Rochester Joint Bd., Amalgamated Clothing & Textile Worker's Union v. NLRB*, 896 F.2d 24, 28 (2d Cir. 1990); *see also Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943) ("[A remedial order] should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."); *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 769 (2d Cir. 1996). Based on our review of the record, we find that the Board did not abuse its discretion in issuing its corporate-wide cease-and-desist order against PBS. Although PBS's clear pattern of unlawful activity warranted a strict remedy, *see Containair Sys. Corp v. NLRB*, 521 F.2d 1166, 1171 (2d Cir. 1975) (stating that the Board has a duty to impose "broader and more stringent remedies against a recidivist than those usually invoked against a first offender"), we must nonetheless defer to the Board's determination as to the proper scope of the remedial order since "[t]he problem of how drastic to mold the remedy in a particular proceeding concerned with the latest in a series of violations calls for the sensitive exercise of administrative judgment, and we cannot substitute our own opinion for the Board's reasoned explication," *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 1007 (2d Cir. 1973).

## CONCLUSION

For the foregoing reasons, we VACATE the Board's decisions insofar as the agency found it was precluded from considering whether PBS was individually a successor employer to Clean-Right, and REMAND with instructions that the Board determine: (1) whether PBS was a successor employer to Clean-Right, and thus violated Section 8(a)(1)(5) of the Act by failing to bargain with Local 32BJ; and (2) if so, whether this ruling comports with due process, and, if it

23

does not, whether remand to the ALJ is appropriate under *Enloe Medical Center*, 346 N.L.R.B. 854. In its analysis of these issues, the Board should apply its single-location unit presumption or articulate why this presumption is inapplicable. We ENFORCE the Board's decisions in all other respects.